In re Kenneth K. ELLSWORTH and
Jessica T. Ellsworth, Debtors.

Kenneth K. Ellsworth; Jessica
T. Ellsworth, Appellants,

v.

Lifescape Medical Associates, P.C.;
Edward J. Maney, Chapter 13
Trustee, Appellees.

BAP No. AZ–10–1253–MkMaD.
Bankruptcy No. 07–00986–CGC.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted May 13, 2011.

Decided July 29, 2011.

Tracy S. Essig of the Law Office of Tracy S. Essig, PLC argued for appellants.

Joseph E. Cotterman of Gallagher & Kennedy, P.A. argued for appellee LifeScape Medical Associates, P.C.

Before: MARKELL, MANN * and DUNN, Bankruptcy Judges.

## OPINION

MARKELL, Bankruptcy Judge.

## INTRODUCTION

Doctor Jessica Ellsworth, M.D., and Kenneth Ellsworth (jointly, the "Ellsworths") appeal the bankruptcy court's order granting the motion of Lifescape Medical Associates, P.C. ("Lifescape") to dismiss the Ellsworths' chapter 13[1] bankruptcy case with prejudice. The Ellsworths have not established that the bankruptcy court abused its discretion in dismissing their case with prejudice, nor

have they established that any of the bankruptcy court's key findings supporting that dismissal were clearly erroneous. Therefore, we AFFIRM.

## FACTS

■ Lifescape is a provider of concierge medical services.[2] Dr. Ellsworth began working with Lifescape in 2003. At that time, she signed a non-compete agreement. Dr. Ellsworth ceased working with Lifescape in 2004, and shortly thereafter founded her own medical practice known as Family Practice of Scottsdale (the "Medical Practice").

## 1. The Injunction Litigation

In 2005, Lifescape sought and obtained an injunction against Dr. Ellsworth in Arizona state court (the "Injunction Litigation"). Dr. Ellsworth appealed the injunction, but failed to obtain a reversal from the Arizona Court of Appeals or the Arizona Supreme Court. Lifescape ultimately obtained a judgment for its attorney's fees and costs incurred in prosecuting the Injunction Litigation and defending against Dr. Ellsworth's appeal (the "State Court Judgment").

## 2. The Ellsworths' Chapter 13 Bankruptcy and Plan

When the Ellsworths filed chapter 13 bankruptcy on March 8, 2007, they listed only five debts. Two were secured; one for their Mercedes and one for their house

---

* Hon. Margaret M. Mann, Bankruptcy Judge for the Southern District of California, sitting by designation.

1. Unless specified otherwise, all chapter and section references are to title 11 of the United States Code, commonly referred to as the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

2. "Concierge Medicine" generally refers to a range of premium medical services that physicians will provide to a limited number of subscribing patients in exchange for an annual fee. See Vasilios J. Kalogredis, *Should You Consider Concierge Medicine?*, PHYSICIAN'S NEWS DIGEST, Feb. 2004, http://www.physiciansnews.com/business/204.kalogredis.html.

(in which they claimed over $250,000 in equity). The remaining three debts were listed as unsecured; two related to student loans in the aggregate amount of $194,706, and the remaining debt was Lifescape's, listed at $58,000.[3]

The Ellsworths filed their initial chapter 13 plan on March 21, 2007, shortly after they filed their bankruptcy. This plan provided for monthly payments of $200, plus a $20,000 balloon payment payable in month 48. A few weeks later, they filed their first amended plan.[4] Unlike their first plan, the amended plan omitted a balloon payment. The effect of this omission was to reduce the aggregate amount of payments by more than 60%.

Lifescape objected to confirmation of the amended plan, claiming that the Ellsworths had understated their income, had overstated their expenses, and were not committing all of their projected disposable income to plan payments as required under § 1325(b). After several lengthy continuances to afford time for discovery, briefing, and mediation, a confirmation hearing was set for July 2008.

Less than a week before the scheduled confirmation hearing, the Ellsworths filed their second amended chapter 13 plan (the "July 2008 Plan"). The July 2008 Plan provided for sixty monthly payments, with $202 payments for months 1 through 16, $500 payments for months 17 through 59, and a balloon payment of $25,000 for month 60.[5]

The bankruptcy court held a plan confirmation hearing in August 2008. In January 2009, it entered an order denying confirmation of the July 2008 Plan (the "January 2009 Order"). Many reasons supported this denial. Among other things, the court noted that the Ellsworths' financial records were "a shambles." The bankruptcy court also noted that the Ellsworths' disposable income calculation, derived from Form B22C, included over $34,000 in nonrecurring legal expenses that had been incurred in defending against the Injunction Litigation. Moreover, only about $10,000 of that amount was incurred within six months of the Ellsworths' bankruptcy, as required for Form B22C calculation and disclosure.

The court found that it was "clearly inappropriate" for the Ellsworths to have claimed the entire $34,000 in legal expenses, given the statutory definition of current monthly income.[6] The court also

---

3. By the time the bankruptcy court denied confirmation of the Ellsworths' second amended chapter 13 plan in January 2009, the debt owed to Lifescape had increased to an amount in excess of $133,000.

4. The excerpts of record provided by the parties were limited to several of the bankruptcy court's orders, and excerpts from several hearing transcripts. We have exercised our discretion to independently review the bankruptcy court's electronic docket, and the imaged documents attached thereto. *See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957–58 (9th Cir. 1989); *Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n. 9 (9th Cir. BAP 2003).

5. It is not clear from the record presented why the $20,000 balloon payment was omitted from the first amended plan, or why a larger $25,000 balloon payment was added to the July 2008 Plan, or how the Ellsworths expected to fund the balloon payment, or, for that matter, any of the plan payments. According to the July 3, 2008 version of the Ellsworths' Form B22C, they had *negative* monthly disposable income of $1,147.94.

6. As set forth in the Bankruptcy Code, the term "current monthly income" in relevant part means:

(A) ... the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6–month period ending on—

pointed out that the Ellsworths had submitted two different statements of the Medical Practice's revenue and expenses for 2006, and that these two statements contradicted each other. As the court further recounted, the Ellsworths initially had indicated that the Medical Practice was conducted through a separate professional limited liability company; however, the Ellsworths later filed a brief (after the August 2008 confirmation hearing) in which they changed their story—indicating that Dr. Ellsworth owned and operated the Medical Practice as a sole proprietorship until December 31, 2006.

Following *Drummond v. Wiegand (In re Wiegand)*, 386 B.R. 238 (9th Cir. BAP 2008), the bankruptcy court ruled that none of the Ellsworths' $34,000 in legal expenses from the Injunction Litigation should have been considered in calculating the Ellsworths' current monthly income for Form B22C because those were business expenses of a self-employed debtor. The bankruptcy court also ruled that, in calculating disposable income under § 1325(b), none of the $34,000 in legal expenses should have been considered because these expenses would not recur.

The January 2009 Order required the Ellsworths, within thirty days, to file a new plan. They didn't. It also required them to file new versions of their Form B22C. They nominally complied with this part of the order, filing an amended Form B22C (the "February 2009 Form B22C") which, consistent with the January 2009 Order, did not deduct any of the Medical Practice's business expenses in calculating current monthly income. This form, consistent with the bankruptcy court's instruc-

tions and *Wiegand, supra*, deducted $26,407.00 in estimated average monthly business expenses from the Ellsworths' current monthly income of $23,202.74. This calculation produced a monthly disposable income of *negative* $3,204.26.

In March 2009, the Ellsworths filed a request for a status conference on plan confirmation, in which they asserted that an evidentiary hearing was necessary before a plan could be confirmed. They also requested that the court set discovery and briefing deadlines.

### 3. Lifescape's Motion to Dismiss

Thereafter, in April 2009, Lifescape filed a motion to dismiss the Ellsworths' case "with prejudice." Lifescape alleged four grounds as establishing cause for such a dismissal: (1) unreasonable delay by the debtor that was prejudicial to creditors; (2) failure to file a plan timely under § 1321; (3) denial of confirmation of a plan under § 1325 and denial of a request made for additional time to file another plan or a modified plan; and (4) bad faith.

The Ellsworths responded by denying all of Lifescape's allegations. While they admitted that Lifescape's judgment was the immediate cause of their bankruptcy filing, they denied that they sought to defeat the Injunction Litigation or the resulting judgment. Further, the Ellsworths repeatedly asserted that it was unnecessary for them to have complied with the January 2009 Order's requirement to file an amended plan because their February 2009 Form B22C showed that they had negative disposable income.

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii)....

11 U.S.C. § 101(10A)(A) (West 2011).

The court held a series of status conferences on the motion to dismiss over the next several months. Lifescape and the chapter 13 trustee (the "Trustee") took depositions of the Ellsworths as well as their accountant. The parties each filed pre-and post-hearing briefs in support of their respective positions and a joint pretrial statement.

In spite of all these preparations, the Ellsworths decided to change the game by a series of filings just before the continued September 11 evidentiary hearing (the "September 11 Evidentiary Hearing"). Twelve days before the scheduled hearing, the Ellsworths filed thirteen months' worth of operating reports. Two days before the hearing, they filed a further amended Form B22C (the "September 2009 Form B22C"), and one day before the hearing they filed a new chapter 13 plan (the "September 2009 Plan").

These new documents changed significantly the effect of the Ellsworths' plan by increasing their planned charitable donations, and by recalculating many of their operating expenses. These new documents also showed positive disposable income of $412, as opposed to the negative disposable income shown on the February 2009 Form B22C.[7] The September 2009 Plan provided for sixty monthly payments, with a $202 monthly payment for months 1 through 16, a $500 payment for months 17 through 27, no payments for months 28 through 31, a $1,350 payment for months 32 through 59, and a final balloon payment of $26,350 in month sixty.

Following the September 11 Evidentiary Hearing, the Trustee filed a post-hearing brief in which he essentially sided with Lifescape. The Trustee asserted that three of the four "bad faith" factors enumerated in *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir.1999) ("*Leavitt I*")[8] were satisfied by the circumstances surrounding the Ellsworths' bankruptcy case. According to the Trustee, the bankruptcy was filed for only one purpose: to obtain a discharge of Lifescape's judgment arising from the Injunction Litigation without paying it in full. The Trustee also pointed to incomplete, inconsistent, and missing financial information submitted by the Ellsworths. In addition, the Trustee argued that a number of significant facts about the Ellsworths' finances became apparent only after their depositions were taken. These new facts included the revelation that, immediately prior to filing, Mr. Ellsworth had withdrawn nearly $10,000 from one of the Ellsworths' bank accounts in order to prepay their utilities and to prepay the costs of a future surgical procedure for Dr. Ellsworth.

### 4. The Ruling on the Motion to Dismiss

On March 24, 2010, the court issued a written ruling granting Lifescape's motion to dismiss. In justifying dismissal, the court in part relied upon (and incorporated by reference) its January 2009 Order, the main thrust of which "was that the court did not trust the numbers provided by the [Ellsworths]. . . ."[9] The court also noted

---

7. The Ellsworths also filed amended Schedules I and J, showing monthly net income of $467.

8. We refer to the court of appeals' decision as *Leavitt I* because, elsewhere in this Opinion, we refer to our decision, *Leavitt v. Soto (In re Leavitt)*, 209 B.R. 935 (9th Cir. BAP 1997), aff'd, 171 F.3d at 1219, as "*Leavitt II*."

9. The court further pointed out that it had reiterated this concern during the first status conference on the motion to dismiss, held on April 14, 2009. Indeed, during the April 14 hearing, the court, at length and more than once, voiced grave concerns regarding the trustworthiness of the Ellsworths' financial

that the January 2009 Order had required the Ellsworths to file a new plan by no later than February 11, 2009, which they had not done.

In connection with its ruling, the court made several key findings of fact and conclusions of law. Initially, the court found that the Ellsworths had unreasonably delayed in filing their September 2009 Form B22C and September 2009 Plan. Both documents contained significant changes that could have and should have been made before the eve of the September 11 Evidentiary Hearing. Under the circumstances, the bankruptcy court found that the Ellsworths' filing of the September 2009 Form B22C and the September 2009 Plan on the eve of the September 11 Evidentiary Hearing prejudiced Lifescape by ensuring that Lifescape could not properly prepare for the confirmation hearing on the newly-filed plan.

The Ellsworths attempted to justify their late filings by pointing to the Ninth Circuit's decision in *Ransom v. MBNA Am. Bank, N.A. (In re Ransom),* 577 F.3d 1026 (9th Cir.2009), *aff'd, Ransom v. FIA Card Servs., N.A.,* — U.S. ——, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011), issued in August 2009, and then claiming that this recent decision necessitated the filing of their September 2009 Form B22C and September 2009 Plan.

The court rejected the Ellsworths' excuse. The court reminded the Ellsworths that it had told them that the court intended to follow the prior BAP decision in

*Ransom,* which required the same changes to the plan and to the Form B22C that the Ellsworths belatedly attempted to make in their September 2009 Form B22C and their September 2009 Plan. Further, the changes made were not confined to those required by the Court of Appeals' ruling in *Ransom*—the Ellsworths had made material changes to non-car-related expenses, and significantly increased their charitable contributions.

The court also found that the Ellsworths only had a few creditors, and Lifescape was the only creditor who would be adversely affected by the bankruptcy and by the Ellsworths' proposed plans. From this, and their historic efforts to avoid the financial consequences of the Injunction Litigation, the court concluded that the only purpose of the bankruptcy was to discharge the debt owed to Lifescape without paying it in full.

With respect to Lifescape's allegations of bad faith, the court examined the Ellsworths' claim that they were unable to pay Lifescape outside of bankruptcy. The bankruptcy court looked askance at this claim; the Ellsworths had offered no evidence that they made any attempt before filing bankruptcy to pay the judgment or to rework their finances so as to be able to satisfy the judgment. In particular, there was no evidence that the Ellsworths considering refinancing their residence, even though their bankruptcy schedules indicated it had $250,000 in equity. The court also took as evidence of bad faith the

---

reporting. One instance illustrates the court's view:

I don't trust any of these numbers. And I don't think it's good for your client having me not trust the numbers.

. . .

And so you got to figure out a way to get to the point where everybody trusts and understands the numbers. And your client has to understand that in the absence of

that I'm going to grant [the motion to dismiss].

. . .

I mean we have to understand where this case is going and why it's going there. And what these expenses are. And what she can pay and what she can't pay. And why she can't pay it if she can't. Or, like I said, this is not an appropriate case for a 13 and I'll grant the motion.

Ellsworths' recalcitrance in only begrudgingly amending key schedules and documents to increase payments to Lifescape. In the first three versions of their Form B22C, the Ellsworths reported improper business expenses for the Medical Practice. These included: (1) payments for Dr. Ellsworth's salary, (2) attorney's fees for the Ellsworths' bankruptcy attorney, (3) payments for Dr. Ellsworth's student loans, and (4) payments for the loan that enabled Dr. Ellsworth to purchase her Mercedes.

The Ellsworths' reporting of these expenses should have been corrected, at the latest, by the time the Ellsworths filed their February 2009 Form B22C, but the Ellsworths did not correct these items until the eve of the September 11 Evidentiary Hearing, when they filed their September 2009 Form B22C.

The court also saw latent and improper gamesmanship in the manner in which the Ellsworths reported the amount of their charitable giving. The Ellsworths incorrectly reported a charitable giving expense of $650 per month in the first three versions of their Form B22C, whereas the amount reported in their September 2009 Form B22C was almost twice that amount, or $1,199 per month.

## 5. The Ellsworths' Motion for Rehearing

Shortly after the court issued its March 24, 2010 ruling, Lifescape lodged a proposed form of order. The Ellsworths objected, and also filed a motion for rehearing under Civil Rule 59 (made applicable in bankruptcy cases by Rule 9023). According to the Ellsworths, they had a reasoned basis for not following the BAP's holding in *Ransom* and not immediately making the necessary corrections in their February 2009 Form B22C. Even though they have admitted that they were aware of the

bankruptcy court's announced intention to follow the BAP's holding in *Ransom,* the Ellsworths asserted that they had found a case at odds with the BAP's holding in *Ransom* from the U.S. District Court for the Eastern District of Washington. This case, *Brunner v. Armstrong (In re Armstrong),* 395 B.R. 127 (E.D.Wash.2008), purportedly justified their decision not to comply with the court's January 2009 Order because it rejected the BAP's reasoning and holding in *Ransom.* The Ellsworths further argued that there was no evidence in the record to support the court's bad faith finding and that the court's ruling, in effect, would force future debtors to use their exempt equity in their homestead to pay off their creditors or else face the prospect of a finding of bad faith. The Ellsworths finally suggested that the court's focus on their charitable giving interfered with their First Amendment right to freedom of religion.

The court denied the Ellsworths' Civil Rule 59 motion in a written ruling issued without a hearing. According to the bankruptcy court, the Ellsworths had not set forth cause for reconsideration of the court's ruling. As the court stated,

> [T]he Debtors do not present an error of law or fact. Each of [the Ellsworths'] actions alone may have been justifiable, but they were part of an overall pattern by the Debtors under which forms were filed late and numbers changed when the forms were filed. The Court has already thought this through and will not do so again.

The court then held that the totality of the circumstances had established the Ellsworths' bad faith in filing bankruptcy, and that bad faith constituted cause for dismissal of the case with prejudice under *Leavitt I:*

> Dismissal with prejudice is justified. Lifescape's [*sic*] asked the Court to dis-

miss with prejudice in their motion to dismiss. Bad faith is cause for dismissal with prejudice. *In re Leavitt* at 393. Here the Court found bad faith by the [Ellsworths] under the *Leavitt* factors and will therefore dismiss with prejudice.

On July 22, 2010, the court entered its order dismissing the case with prejudice, and the Ellsworths timely appealed.[10]

## STANDARD OF REVIEW

■■■■ We review the bankruptcy court's dismissal of a chapter 13 bankruptcy case for abuse of discretion, regardless of whether the court dismisses under any of the enumerated paragraphs of Section 1307(c), or for bad faith. *See Leavitt I,* 171 F.3d at 1222–23; *Ho v. Dowell (In re Ho),* 274 B.R. 867, 871 (9th Cir. BAP 2002).

■■■■ To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible or "without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson,* 585 F.3d 1247, 1261–62 & n. 21 (9th Cir.2009) (en banc). "If the bankruptcy court did not identify the correct legal rule, or its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record, then the bankruptcy court has abused its discretion." *USAA Fed. Sav. Bank v. Thacker (In re Taylor),* 599 F.3d 880, 887–88 (9th Cir.2010) (citing *United States v. Hinkson,*

585 F.3d 1247, 1261–62 (9th Cir.2009) (en banc)).

■■■■ In particular, when a bankruptcy court makes factual findings of bad faith to support dismissal of a chapter 13 case, we review those findings for clear error. *See Leavitt I,* 171 F.3d at 1222–23; *Greatwood v. IRS (In re Greatwood),* 194 B.R. 637, 639 (9th Cir. BAP 1996); Rule 8013. Under this standard, "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). As a consequence, so long as the bankruptcy court applied the correct legal standard, we must affirm unless the bankruptcy court's findings of bad faith were clearly erroneous.

## DISCUSSION

**A. The bankruptcy court did not err in finding bad faith or in finding that other cause existed to dismiss the Ellsworths' bankruptcy.**

Section 1307(c) enumerates eleven non-exclusive grounds which may constitute "cause" for dismissal. In relevant part, § 1307(c) gives the bankruptcy court discretion to dismiss based on:

(1) unreasonable delay by the debtor that is prejudicial to creditors;

. . .

(3) failure to file a plan timely under section 1321 of this title;

. . .

(5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time

---

**10.** The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A), and

we have jurisdiction under 28 U.S.C. § 158.

for filing another plan or a modification of a plan. . . .

■■ Even though § 1307(c) does not explicitly mention it, the bad faith filing of a bankruptcy petition also may constitute "cause" for dismissal. *Leavitt I,* 171 F.3d at 1224. Furthermore, a bad faith bankruptcy filing may justify dismissal of the case with prejudice, under § 349. *See id.* at 1223.

In this case, the bankruptcy court determined that cause existed to dismiss the case under § 1307(c)(1), (3) and (5), and because the Ellsworths filed their bankruptcy petition in bad faith. The Ellsworths argue that the bankruptcy court erred because "there was no evidence" to support the bankruptcy court's findings. In particular, the Ellsworths argue that they had reasonable explanations for any missteps they made in prosecuting their bankruptcy case and that "no evidence or testimony was ever presented refuting" their explanations. Consequently, they assert, the bankruptcy court could not and should not have found any cause for dismissal. We disagree.

### 1. Section 1307(c)(1)

■ A debtor's unjustified failure to expeditiously accomplish any task required either to propose or to confirm a chapter 13 plan may constitute cause for dismissal under § 1307(c)(1). *See Howard v. Lexington Invs., Inc.,* 284 F.3d 320, 323 (1st Cir.2002) (failure to file necessary tax returns); *Badalyan v. Holub (In re Badalyan),* 236 B.R. 633, 638 (6th Cir.BAP1999) (failure to file amended plan and to file legal memoranda supporting debtor's assertions); *see also Vomhof v. United States,* 207 B.R. 191, 193 (D.Minn.1997) ("Failure to supply crucial information required by a court order is proper grounds for dismissal under § 1307(c)(1).").

■ Here, the bankruptcy court found that the Ellsworths unjustifiably delayed their bankruptcy case by not promptly resolving issues concerning the trustworthiness of their financial reporting. The record supports this finding. The court warned the Ellsworths at the April 14, 2009 status conference (more than two years into their bankruptcy case) that the court doubted the accuracy and transparency of their financial information and that their chapter 13 case would be dismissed unless the Ellsworths expeditiously resolved the court's doubts. Yet many important issues regarding how the Ellsworths reported certain expenses and how the Medical Practice paid these expenses (e.g., payment of bankruptcy legal fees, payments on Dr. Ellsworth's Mercedes, and payment of student loan debt) only became apparent after Lifescape and the Trustee took the depositions of the Ellsworths and their accountant. Furthermore, the Ellsworths for the first time came up with a proposed resolution for these payment issues in their September 2009 Plan and in their September 2009 Form B22C, both filed on the eve of the September 11 Evidentiary Hearing on the motion to dismiss. This was simply too little, too late.

Moreover, the need on the eve of the hearing to correct the obvious and significant error in the reporting of their charitable giving expense reflected that the Ellsworths did not take seriously the court's admonitions regarding the need for their numbers to be accurate. It would have been a relatively simple matter for either the Ellsworths, or their accountant, or their attorneys, to proofread for accuracy the then-current version of their Form B22C, but no one apparently did. Or if they did, no one bothered to file and serve a corrected Form B22C until the eve of the September 11 Evidentiary Hearing.

The Ellsworths' appeal brief suggests that their missteps were inadvertent and/or that they resulted from the ineffective assistance of counsel. But the court found, based on the entire record, that the delay was unjustified. We cannot say on this record that this finding was "illogical," "implausible," or "without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1262 n. 21.

The record also supports the bankruptcy court's finding that Lifescape was prejudiced by the delay. Because the Ellsworths were either unwilling or unable to identify and/or attempt to resolve many of the issues concerning their Form B22C until the eve of the September 11 Evidentiary Hearing, Lifescape was hindered in its ability to respond to the Ellsworths' financial reporting and plan proposals. Simply put, Lifescape was forced to aim at a fuzzy and constantly-moving target for no reason other than the Ellsworths could not or would not address earlier the problems with the prior versions of their Form B22C. In short, the court did not clearly err when it found that the delay in addressing the accuracy and transparency of their financial reporting prejudiced Lifescape.

## 2. Section 1307(c)(3)

Section 1307(c)(3) is simply phrased. Cause for dismissal exists for "failure to file a plan timely under Section 1321." Under this provision, a plan is untimely unless it is filed within the fourteen-day deadline provided for in Rule 3015 or within such other deadline as the court duly orders. *See* Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy*, http://www.ch13online.com/Subscriber/Chapter_13_Bankruptcy_4th_Lundin_Brown.aspx, § 55.1, at ¶ [6] (4th ed., 2004 rev.) (citing cases). This paragraph is an important restriction on a chapter 13 debtor who, unlike a chapter 11 debtor, is the only entity that may file a plan. 8 *Collier on Bankruptcy* ¶ 1321.01 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011) ("The chapter 13 debtor has the exclusive right to file a plan.").

Paragraph (3) of § 1307(c) applies not only to the first plan filed, but also to any subsequent plan or modification required by the court. *See* § 1329(b)(2) ("The plan as modified becomes the plan...."). Here, the Ellsworths failed to file timely a plan as required by the bankruptcy court's January 2009 Order. Under that order, the Ellsworths were to file a new plan within thirty days. But they did not file a new plan until September 2009, seven months after the court's deadline.

The Ellsworths argue that they did not need to comply with the deadline because they had no disposable income to support the filing of a new plan and that the need for a new plan only became apparent after the Ninth Circuit Court of Appeals issued its decision in *Ransom*. The bankruptcy court found, and we agree, that the Ellsworths' excuses for not complying with the deadline in the January 2009 Order were unpersuasive.

The Ellsworths flouted the court's specific order at their peril. They apparently thought their inaction was justified because they assumed that the court's implicit reasoning (as opposed to its explicit words) no longer compelled them to file a new plan. But even if this kind of tortured logic—ignoring express language based on a supposition that the court would later see it their way and absolve them of any noncompliance—had any validity, the Ellsworths had no substantial basis for their supposition.

Part of the Ellsworths' claim is that a new plan was not necessary because they contended that *Ransom* would soon no longer be binding. Not only did this prognostication prove wrong, it was contrary to what the bankruptcy court actually said; indeed, they admitted they were aware of the court's stated intent to follow the BAP's holding in *Ransom*.

The Ellsworths then offer a variant on this argument. They argue *Armstrong*, 395 B.R. 127, was at odds with the BAP's holding in *Ransom*, and thus *Armstrong's* contrary holding justified their inaction. But *Armstrong* was not binding on the bankruptcy court, and nothing in *Armstrong* or elsewhere made it appropriate for the Ellsworths simply to ignore the court's ordered thirty-day deadline for filing a new plan. If the Ellsworths believed that the deadline needed modification, they should have sought modification or clarification of the order. They never did, essentially substituting their judgment for the court's. This was obviously improper. Thus, we cannot say that the finding of the bankruptcy court concerning the untimeliness of the Ellsworths' plan was clearly erroneous. Dismissal under § 1307(c)(3) was appropriate.

### 3. Section 1307(c)(5)

The considerations referenced above also likely support the court's dismissal under § 1307(c)(5)—based on denial of confirmation of a plan and denial of a request made for additional time to file a new plan. However, dismissal under § 1307(c)(5) often requires an express request for additional time to file a plan, and a denial thereof. *See Nelson v. Meyer (In re Nelson)*, 343 B.R. 671, 676 & n. 9 (9th Cir. BAP 2006). Here, the Ellsworths never explicitly requested additional time to file a plan. We might, however, construe their September 2009 Plan as an implicit, belated request for additional time, which request the bankruptcy court implicitly denied when it declined to consider the merits of the September 2009 Plan. We need not decide, however, whether these facts satisfy the requirements of § 1307(c)(5) in light of our rulings on the other grounds for dismissal. Dismissal was justified regardless of the propriety of the bankruptcy court's reasoning on § 1307(c)(5).

### 4. Bad Faith

The bankruptcy court additionally found that the Ellsworths filed their bankruptcy in bad faith, and that the bad faith filing served as cause for dismissal. A chapter 13 petition which is filed in bad faith may be dismissed "for cause" under § 1307(c). *Leavitt I*, 171 F.3d at 1224; *Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir.1994) (per curiam); *In re Ho*, 274 B.R. at 876–77. "To determine if a petition has been filed in bad faith courts are guided by the standards used to evaluate whether a plan has been proposed in bad faith." *Eisen*, 14 F.3d at 470. In reaching this determination, a bankruptcy court must review the "totality of the circumstances" to determine if a petition was filed in bad faith. *Id.; Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1390–91 (9th Cir. 1982). *See* Lundin & Brown, *supra*, at § 334.1, at ¶ [6] ("the test for bad-faith dismissal of a Chapter 13 case under § 1307(c) is similar to the analysis of good faith required for confirmation under § 1325(a)(3)").

In *Leavitt I*, the Ninth Circuit expanded on *Eisen* and held that when considering dismissal of a chapter 13 case due to bad faith in its filing, a bankruptcy court should consider: (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Code, or otherwise filed his petition or plan in an

inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended to defeat state court litigation; and (4) whether egregious behavior is present. *Leavitt I*, 171 F.3d at 1224; *see also In re Ho*, 274 B.R. at 876; *Collier, supra*, ¶ 1307.04[10].[11]

■ When seeking confirmation of a plan, the debtor, as plan proponent, has the burden of proof on the issues of whether both the case and the plan were filed in good faith. § 1325(a)(3), (7). When a creditor seeks dismissal due to bad faith, the applicable burden of proof is not as clear. We acknowledge that *Leavitt II* states that, for purposes of determining whether cause exists to dismiss a chapter 13 case based on bad faith, the "[d]ebtor bears the burden of proving that the petition was filed in good faith." *Leavitt II*, 209 B.R. at 940.[12] As applied to chapter 13 as in force in 1997, when we decided *Leavitt II*, this statement was unexceptional. In 1997, there was no statutory requirement that a chapter 13 case be filed in good faith; the present requirement, now contained in § 1325(a)(7), was not added formally until 2005. It is thus true now that the debtor, as plan proponent, has the burden of proof on the confirmation issues of whether both the case *and* the plan were filed in good faith. § 1325(a)(3), (7).

If the question were close, we might question the strength and applicability of *Leavitt II's* statement regarding burden of proof for motions to dismiss given the 2005 statutory addition of § 1325(a)(7), and given, as other courts have noted, that such a statement runs contrary to the ordinary notion that a movant bears the burden of production and persuasion as to the relief requested. *See, e.g., In re Lancaster*, 280 B.R. 468, 474 (Bankr.W.D.Mo.2002) ("The difference between good faith in filing a case and good faith in proposing a plan is relatively minor, and the evidence on both issues may properly be considered together.... Perhaps the only real distinction between the two is in the burden of proof. Under § 1307(c), the objecting creditor bears the burden of proof."); *In re Virden*, 279 B.R. 401, 407–11 (Bankr.D.Mass.2002) ("The same standard for finding good, or bad, faith may properly be used [under §§ 1307(c) and 1325(a)(3) ], the only distinction being who bears the burden of proof.... Under Section 1307(c), the objecting creditor bears the burden of proof."). This is especially the case when, given the more serious consequences of dismissal, leading treatises recognize that "proof sufficient to deny confirmation of a plan for lack of good faith will not always also be sufficient to dismiss the case for cause." Lundin & Brown, *supra*, § 334.1, at ¶ [6]; *see also Collier, supra*, at ¶ 1307.04[10] ("Because dismissal is a harsher remedy than denial of plan confir-

---

11. As stated in Lundin & Brown:

> The characteristics of a bad-faith Chapter 13 case include the presence of few creditors, filing on the eve of a foreclosure sale or on the eve of some other litigation event in another court, the debtor's failure to meet deadlines for filing or amending the statement, schedules or the plan, the debtor's failure to attend the meeting of creditors or other hearings, a plan that proposes little payment to creditors, a plan that has no hope of confirmation and general lying, cheating or stealing by the debtor.

Lundin & Brown, *supra*, at 334.1, at ¶ 6.

12. *Leavitt II* relied solely on *In re Powers*, 135 B.R. 980, 997 (Bankr.C.D.Cal.1991). *Powers* dealt directly with bad faith in filing, but hedged its statement regarding the debtor's burden by placing that burden on the debtor only "once a debtor's good faith is in issue," *id.*, which could be read to shift the burden to the debtor only after the movant has met its burden of going forward with the evidence. Other cases cited by *Powers* also indicate that in that court's view, before the 2005 amendments, a debtor's burden was one of persuasion after the movant introduced evidence suggestive of a bad faith filing. *Id.* at 997–98.

mation, the showing of bad faith required for dismissal should be greater than that necessary for denial of confirmation." (citing *In re Love,* 957 F.2d 1350, 1356 (7th Cir.1992))).

But we need not address now the propriety of *Leavitt II's* statement regarding the burden of proof. The Ellsworths did not raise or brief the issue of the burden of proof either in the bankruptcy court or on appeal and thus we are not obliged to address it. *See Golden v. Chicago Title Ins. Co. (In re Choo),* 273 B.R. 608, 613 (9th Cir. BAP 2002); *Branam v. Crowder (In re Branam),* 226 B.R. 45, 55 (9th Cir. BAP 1998), *aff'd,* 205 F.3d 1350 (table) (9th Cir.1999). *But cf. Tyner v. Nicholson (In re Nicholson),* 435 B.R. 622, 634 (9th Cir. BAP 2010) (holding that panel would review evidentiary standard challenged for the first time on appeal when the bankruptcy court's application of an erroneous evidentiary standard might have caused it to reach a different result).

More importantly, however, any error by the bankruptcy court in concluding that the Ellsworths had the burden of proof on the bad faith issue was harmless. The record reflects ample evidence to establish the Ellsworths' bad faith. As a result, the assignment of the burden of proof on the bad faith issue played no material role in the bankruptcy court's bad faith finding; the facts were not anywhere close to equipoise. Consequently, we will leave for another day the issue of whether *Leavitt II's* statement regarding the burden of proof requires review.

Regardless of who has the burden of proof, the point remains that it is well established that a lack of good faith constitutes "cause" to dismiss a chapter 13 case, and that courts may look at the same evidence for both confirmation and dismissal purposes. As the Ninth Circuit has stated, albeit in dicta:

[W]e have held that bad faith does provide "cause" to dismiss Chapter 11 and Chapter 13 bankruptcy petitions.... The Bankruptcy Code specifically mentions good faith in Chapters 11 and 13 when it permits a court to confirm a payment plan only if it is proposed in good faith.... In *[Eisen v. Curry (In re Eisen),* 14 F.3d 469 (9th Cir.1994),]* we linked the good faith requirement implicit in a Chapter 13 bankruptcy with the good faith requirement for proposing a payment plan when we stated that "[t]o determine if a petition has been filed in bad faith courts are guided by the standards used to evaluate whether a plan has been proposed in bad faith." ... The Bankruptcy Code's language and the protracted relationship between reorganization debtors and their creditors lead us to conclude that bad faith per se can properly constitute "cause" for dismissal of a Chapter 11 or Chapter 13 petition....

*Neary v. Padilla (In re Padilla),* 222 F.3d 1184, 1192–93 (9th Cir.2000).

In dismissing the Ellsworths' case, the bankruptcy court employed and appropriately considered all these factors. In particular, it relied on *Leavitt I's* holding that bad faith was a ground for dismissal under § 1307(c), and looked at the totality of the circumstances and the four factors enumerated in *Leavitt I* in finding the Ellsworths filed and prosecuted their case in bad faith. Against these standards, it weighed all evidence in a reasoned, well-written opinion, and concluded that the totality of the circumstances indicated bad faith.

The Ellsworths have not challenged the bankruptcy court's reliance on *Leavitt I.* Rather, they have argued that they had insufficient notice that their alleged bad faith was an issue. And even if there were sufficient notice, they contend that there

was no evidence to support the bankruptcy court's bad faith findings. Further, the Ellsworths claim that the bankruptcy court should have held a separate evidentiary hearing to consider their alleged bad faith.

■ The record belies all the Ellsworths' contentions. Initially, we can dispense with the Ellsworths' claim of lack of notice. Lifescape's motion to dismiss explicitly discussed the Ellsworths' bad faith, and thereafter virtually every other filing discussed the contention. Bad faith also was discussed at a number of the hearings held, and the joint pretrial statement referred to it. Thus, the Ellsworths had ample notice of and opportunity to be heard on the bad faith issue.

■ Similarly, the Ellsworths' argument regarding the sufficiency of the evidence simply ignores key parts of the record. Based upon the numerous uncontested facts, and upon the facts as found by the bankruptcy court and all reasonable inferences from those facts, a court could properly find bad faith. In particular, the timing and circumstances of the Ellsworths' bankruptcy filing were suspicious. The record established that the Ellsworths filed bankruptcy on the heels of the Injunction Litigation. In addition, Lifescape's claim, one of very few scheduled, was the only claim that would have been affected by any discharge; except for Lifescape, the Ellsworths were timely paying all of their other creditors and continued to timely pay all of them post-petition.

Were these facts not sufficient, the bad faith finding was further supported by the Ellsworths' false contention that they unsuccessfully tried to pay Lifescape's claim prepetition—a contention unsupported by any evidence and contrary to their own estimates of the value of their assets. Based on these facts and others, the bankruptcy court found that the only purpose

of the Ellsworths' bankruptcy was the illegitimate one of attempting to discharge and pay a fraction of only one contested debt, a debt their own schedules suggested they could pay in full.

The bankruptcy court's bad faith finding was also bolstered by its concerns regarding the Ellsworths' handling and reporting of their finances, both prepetition and postpetition. Among other concerns, the Ellsworths withdrew close to $10,000 from a bank account on the eve of their bankruptcy filing to prepay certain expenses, which skewed their reporting of both their assets and their expenses. The court's concerns were also justified by the length of the Ellsworths' bankruptcy case without a confirmed plan, as well as the number and inconsistency of their amendments to their financial reporting. The Ellsworths' bankruptcy had been pending for over three years, during which time they filed four different versions of their Form B22C. The last version of their Form B22C, the September 2009 Form B22C, for the first time excluded from their reported business expenses certain payments by the Medical Practice of personal expenses, including Dr. Ellsworth's student loan payments, the payment of the Ellsworths' bankruptcy legal fees, and payments on Dr. Ellsworth's Mercedes, which she purchased while her Medical Practice was still a sole proprietorship.

The September 2009 Form B22C also for the first time revealed that the Ellsworths had been apparently under-reporting $1,200 per month in charitable giving expense by roughly 45%. In short, as of the eve of the September 11 Evidentiary Hearing, the Ellsworths were still attempting to reconcile and resolve their financial reporting, even though the court had expressed, on more than one occasion over the previous year, grave concerns regarding the transparency and accuracy

of that reporting. Indeed, the court had explicitly warned them that continued problems with their reporting would lead to dismissal of their case. The court was well within its power to find these actions to be part of a scheme to continue their bad faith filing.

The Ellsworths' refusal to comply with the court's January 2009 Order was simply more undisputed evidence of the Ellsworths' continuing bad faith. The January 2009 Order directed the Ellsworths to file an amended plan consistent with the order within 30 days, but the Ellsworths did not file the required amended plan until September 2009, thinking that they knew better than the court when they needed to file a new plan.

■ In assessing whether a bankruptcy has been filed in bad faith, the court may infer bad faith from the totality of the surrounding circumstances. *See In re Eisen,* 14 F.3d at 470–71. Further, as we stated at the outset, the trier of fact's choice between two permissible views of the evidence cannot be clearly erroneous. *Anderson,* 470 U.S. at 574, 105 S.Ct. 1504.

Here, the court duly exercised its role as the trier of fact and drew inferences from the totality of the circumstances that the Ellsworths filed their bankruptcy in bad faith. The circumstances reviewed were those identified in *Leavitt I,* a controlling Ninth Circuit precedent that had been on the books for at least ten years. On this record, we cannot say that the court's bad faith finding was clearly erroneous. *See Hinkson,* 585 F.3d at 1262 (stating that findings of fact are not clearly erroneous unless they are "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record."). Since the bankruptcy court also used the correct legal test to decide the dismissal motion, we cannot say the court abused its discretion either. Accordingly,

there are no grounds to reverse the bankruptcy court's determination that "cause" existed to dismiss the Ellsworths' bankruptcy case.

**B. The bankruptcy court did not abuse its discretion when it dismissed the Ellsworths' bankruptcy case with prejudice.**

■ The bankruptcy court did not just dismiss; it dismissed the Ellsworths' case "with prejudice." Under appropriate circumstances, a bankruptcy court may dismiss a bankruptcy case with prejudice. *See* § 349(a); *Leavitt I,* 171 F.3d at 1223 (citing *Colonial Auto Center v. Tomlin (In re Tomlin),* 105 F.3d 933, 937 (4th Cir. 1997)).

■ As a preliminary matter, we note that dismissal of a bankruptcy case "with prejudice" does not have a single, universally-accepted meaning. *See Tomlin,* 105 F.3d at 938–39. Sometimes, when a bankruptcy court uses the phrase "dismissed with prejudice," it merely seeks to invoke § 109(g), which bars the debtor from filing any bankruptcy case for a period of 180 days. *See id.; see also Leavitt II,* 209 B.R. at 941 n. 10.

In *Leavitt I* and *Leavitt II,* however, this Panel and the Ninth Circuit Court of Appeals construed the bankruptcy court's dismissal with prejudice to mean that the debtor was precluded from ever again seeking to discharge those debts which would have been discharged had the plan been confirmed and completed. "A dismissal with prejudice is a complete adjudication of the issues presented by the pleadings and a bar to further action between the parties." *Leavitt II,* 209 B.R. at 939 (citing *Tomlin,* 105 F.3d at 936–37). Functionally, then, a dismissal with prejudice is equivalent to a judgment under § 523(a) that each debt that would have

been discharged under the debtor's plan is thereafter nondischargeable.

The bankruptcy court here was familiar with both *Leavitt I* and *Leavitt II*. The court's use of the phrase "dismissal with prejudice," taken in this context, reflects that the court used the phrase in the same manner as *Leavitt I* and *Leavitt II* used it: to preclude the Ellsworths from ever again seeking to discharge debts which would have been discharged by their plan. Again, functionally, the effect of that ruling here was to make Lifescape's debt nondischargeable; the Ellsworths were either paying or could not discharge any remaining debts.

■ We acknowledge that dismissal with prejudice is a drastic remedy reserved for "extreme situations." *Tomlin*, 105 F.3d at 937. As *Tomlin* explained:

> [A] bankruptcy court rarely uses its authority to bar the discharge of debts in a later case. In any court, a dismissal order that bars subsequent litigation is a severe sanction warranted only by egregious misconduct. Given that the Bankruptcy Code's central purpose is remedial, i.e., to afford insolvent debtors an opportunity to enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt, such an order is particularly devastating in a bankruptcy case. For this reason, a permanent bar to discharge is at times referred to as the capital punishment of bankruptcy, for it removes much of the benefit of the bankruptcy system.

*Id.* (citations and internal quotation marks omitted).

■ We acknowledge the harshness, but do not believe the bankruptcy court abused its discretion here. Dismissal under § 1307(c) is a two-step process. Once the court has determined that cause to dismiss exists, it still must decide what remedial action—what form of dismissal—should be taken. *See In re Nelson*, 343 B.R. at 675; *In re Ho*, 274 B.R. at 877. In both *Nelson* and *Ho*, we focused on the court's need to choose between conversion and dismissal. But, unlike here, dismissal with prejudice was not at issue in *Nelson* and *Ho*. When the court is considering dismissal with prejudice, the second step of this two-step process ordinarily should include consideration of whether some sanction less than dismissal with prejudice would be sufficient. For instance, aside from dismissing with prejudice, a court might consider barring the debtor from refiling for 180 days pursuant to § 109(g), or for some other length of time. Alternately, a court might consider indefinitely barring relief to the debtor only under certain chapters of Title 11. *See* Lundin & Brown, *supra*, § 339.1.

■ *Leavitt I* and *Leavitt II* support this two-step process. In *Leavitt I*, the court of appeals noted that the bankruptcy court held a separate hearing to hear argument and to explicitly consider alternatives to dismissal with prejudice. *Leavitt I*, 171 F.3d at 1222. In *Leavitt II*, we noted that a dismissal with prejudice can raise due process concerns, because such a dismissal can function like a § 727 denial of discharge, but without providing the same procedural protections that are afforded to a debtor when a creditor commences an adversary proceeding objecting to the debtor's discharge under § 727. *Leavitt II*, 209 B.R. at 941–42. We concluded that the procedures employed by the *Leavitt* bankruptcy court satisfied any due process concerns. *Id.* Those procedures included advance notice that dismissal with prejudice was at issue, a separate evidentiary hearing on the issue of whether the case should be dismissed with prejudice (at which time alternatives to dismissal with

prejudice were considered), and an explicit court determination that dismissal with prejudice was the proper remedy under the circumstances. *Id.* at 937–38.[13]

In this case, Lifescape's motion explicitly requested dismissal with prejudice. Thereafter, several months elapsed during which the parties appeared at hearings on the motion, conducted discovery, and filed pre- and post-trial briefs. The parties also prepared a joint pretrial statement, and participated in a formal evidentiary hearing. Once Lifescape raised the issue of dismissal with prejudice and presented a persuasive prima facie case showing sufficient bad faith to justify such a remedy, it was incumbent upon the Ellsworths to attempt to show the bankruptcy court that an alternative to dismissal with prejudice was appropriate. But the Ellsworths did not advocate for, or present any evidence in support of, any alternative. They simply rested on their assertions that dismissal, in any form, was not appropriate.

Consequently, even though the bankruptcy court ordinarily would be expected to explicitly consider alternatives to dismissal with prejudice, the Ellsworths' silence thwarted that task. Simply put, the Ellsworths defaulted on this issue, and we cannot say under these circumstances that the court abused its discretion when it dismissed their case "with prejudice." Given the Ellsworths' bad faith, both independently and taken in conjunction with the other bases for dismissal, we cannot say that the bankruptcy court abused its discretion in dismissing with prejudice.

## CONCLUSION

For the reasons set forth above, the dismissal order of the bankruptcy court is AFFIRMED.

---

**13.** This discussion of *Leavitt I* and *Leavitt II* is not meant to suggest that the second step—determining remedy—necessarily requires a second hearing separate from the hearing determining that cause exists for dismissal or conversion. The bankruptcy court has the discretion to determine whether bifurcation of the issues is appropriate or necessary under the circumstances of the particular case.