**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No. WW-15-1377-JuTaKu |
| ) | |
| SHAUN MICHEIL MARTIN and ) | Bk. No. 13-42847-DBL |
| PATRICIA MAUREEN MCCARTHY, ) | |
| ) | |
|               Debtors. ) | |
| _____) | |
| FEARGHAL MCCARTHY, ) | |
| ) | |
|               Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[*] |
| ) | |
| SHAUN MICHEIL MARTIN; PATRICIA) | |
| MAUREEN MCCARTHY; MICHAEL G. ) | |
| MALAIER, Chapter 13 Trustee, ) | |
| ) | |
|               Appellees. ) | |
| _____) | |

Argued and Submitted on November 17, 2016
at Pasadena, California

Filed - December 6, 2016

Appeal from the United States Bankruptcy Court for the
Western District of Washington

Honorable Brian D. Lynch, Chief Bankruptcy Judge, Presiding

_____

Appearances:   Appellant Fearghal McCarthy argued pro se.

_____

Before: JURY, TAYLOR, and KURTZ, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

-1-

Appellant Fearghal McCarthy (Mr. McCarthy) appeals from the bankruptcy court's order dismissing the chapter 13[1] case of debtors, Shaun Micheil Martin (Mr. Martin) and Patricia McCarthy (Ms. McCarthy) (collectively, Debtors),[2] without prejudice. On appeal, Mr. McCarthy assigns error to the bankruptcy court's decision to dismiss Debtors' case without prejudice, contending that the underlying facts supported dismissal with prejudice. For the reasons stated below, we discern no error and AFFIRM.

## I. FACTS

### A. Prepetition Events

In 2005, the McCarthys were involved in a contentious and acrimonious divorce proceeding. In October 2006, while the divorce was pending, Ms. McCarthy filed a chapter 7 bankruptcy petition and obtained a discharge. The rancor evident in the divorce persisted in the bankruptcy case. In January 2010, a final divorce decree was entered. The state court appointed Mr. McCarthy as custodian of the couple's two sons and ordered Ms. McCarthy to pay child support and provide health insurance for the children. During the divorce proceedings, Mr. McCarthy moved for contempt numerous times resulting in over $30,000 in sanctions against Ms. McCarthy.

In April 2013, Mr. McCarthy applied for a judgment based on a promissory note for $225,000 that Ms. McCarthy had signed as

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] Neither Debtors nor the chapter 13 trustee have appeared in this appeal.

-2-

part of the dissolution proceeding. While Mr. McCarthy's motion for judgment was pending, Debtors purchased a new 2013 Dodge Caravan minivan for $20,794 which they financed at 21% interest. Mr. McCarthy obtained entry of $224,000 judgment on April 24, 2013. He then threatened to garnish Ms. McCarthy's wages.

**B. Bankruptcy Events**

On April 28, 2013, Debtors filed their chapter 13 petition to prevent any garnishments based on the judgment. Debtors' Schedule F showed approximately $350,000 in unsecured debt, including Mr. McCarthy's $224,000 judgment.[3] Ms. McCarthy was also delinquent on her support payments. Debtors' chapter 13 plan stated that they would make monthly payments of $2,000 for thirty-six months and that they elected not to contribute their tax refunds. Secured debt payments were $300 monthly, payable on the Dodge minivan and a 2008 Kia Spectra (Kia).

**1. Debtors First Amended Plan**

Debtors filed a first amended plan dated May 31, 2013. This plan raised the monthly payment to $2,104 with the commitment period still at thirty-six months. Debtors also proposed to use their tax refunds to fund the plan, with the exception of the first $1,400 of each refund. The plan also showed monthly domestic support payments to Mr. McCarthy of $1,000 and raised the monthly payments on their secured car debt

---

[3] Mr. McCarthy asserts that the debts listed in Schedule F are overstated by $91,583, consisting of a mortgage debt that was discharged in Ms. McCarthy's chapter 7 case. He further contends the scheduled debts are understated because the $30,000 in sanctions Mr. McCarthy obtained in the divorce proceedings was not listed.

-3-

to $800.

Mr. McCarthy objected to the confirmation of Debtors' amended plan, contending that Debtors' Form B22C failed to accurately report their household size (three versus five) and their average monthly income. He also alleged that Debtors' plan was proposed in bad faith because they purchased the new minivan prior to filing their bankruptcy case and accelerated payments in the plan on that debt. Mr. McCarthy further argued that Debtors' living expenses included excessive or unwarranted amounts and complained that the plan failed to commit Debtors' federal and state income tax refunds in their entirety.[4]

## 2. Confirmation of Debtors' Second Amended Plan

About a week before the hearing on Mr. McCarthy's objection to Debtors' first amended plan, Debtors filed their second amended plan dated July 30, 2013, causing the evidentiary hearing on confirmation to be rescheduled. Debtors also amended their Schedules I and J. Amended Schedule I showed that Mr. Martin was unemployed and listed his income as between $1,800-$2,200 a month whereas the previous Schedule I showed Mr. Martin's income as $1,004 per month. The amended Form B22C reduced Debtors' household size to three, noted that Debtors were above median income with negative disposable income, and showed the applicable commitment period as five years.

The second amended plan indicated monthly payments of $2,104 for four months and $2500 thereafter for a term of sixty

---

[4] Mr. McCarthy, an accountant by trade, continued to raise issues related to Debtors' tax returns throughout this case.

-4-

months. Debtors' treatment of their tax refunds stayed the same, but they lowered the payment on the minivan to the contractual rate of $519. The plan showed that Debtors would pay at least $95,081.23 to allowed nonpriority unsecured claims for a return of 27% on allowed claims.

Mr. McCarthy objected to Debtors' second amended plan, alleging that the plan was not proposed in good faith due to Debtors' purchase of the minivan prior to their filing. Although some expenses had been adjusted in their amended Schedule J, Mr. McCarthy continued to object to certain expenses as excessive or unwarranted. He further asserted that Debtors offered no reason or authority for their retention of the first $1,400 of any tax refund. He also pointed out that, although Debtors acknowledged a prepetition support payment default of over $11,000, they failed to make a provision for payment of that debt in the plan. Finally, Mr. McCarthy complained that Debtors' Schedule I and J were misleading.

The chapter 13 trustee submitted a brief in support of confirmation.

On November 6, 2013, the bankruptcy court held an evidentiary hearing on confirmation. Mr. Martin, Ms. McCarthy, and Mr. McCarthy testified and numerous exhibits were offered into evidence. The bankruptcy court took the matter under advisement.

On November 21, 2013, the bankruptcy court issued an order setting forth its findings of fact and conclusions of law. The court overruled Mr. McCarthy's objections and confirmed Debtors'

second amended plan.[5]  The court found that Debtors had filed their petition in good faith after applying the factors set forth in Leavitt v. Soto (In re Leavitt), 171 F.3d 1219, 1224 (9th Cir. 1999).  The court also found the plan was proposed in good faith and committed substantially more than their projected disposable income for the sixty month commitment period of the plan.

In addressing Mr. McCarthy's bad faith argument based on the purchase of the minivan, the court concluded that Debtors' purchase did not indicate a lack of good faith when they successfully modified the interest rate from over 20% down to 6% and demonstrated that their family needed a reliable car.

The bankruptcy court also found that the discrepancies in the schedules and Form B22C were mistakes primarily due to the sloppiness of Debtors' attorney and Debtors.  The court opined that neither understood the basic strategy of chapter 13 practice applicable to Debtors' situation.  The court observed that had Debtors' attorney and Debtors properly analyzed the case, Debtors would have rushed to claim they were above median debtors for two reasons.

First, once they corrected the household size to three it was obvious that their monthly projected disposable income was $1080 in the negative.  According to the court, for purposes of

---

[5] Mr. McCarthy also filed a motion to dismiss Debtors' case with prejudice and an order shortening time to have the motion heard the same day as the evidentiary hearing on confirmation. The bankruptcy court denied the order shortening time without prejudice to Mr. McCarthy's refiling of the motion and scheduling a hearing in due course.

-6-

the disposable income test, Debtors would have no obligation to pay any money to nonpriority unsecured creditors such as the claim filed by Mr. McCarthy for the $224,000 judgment and the vast majority of the over $30,000 in monetary sanctions arising out of the dissolution.

Second, the court noted that at the time Debtors filed their case, there was no applicable commitment period for debtors with negative income under the holding in <u>Maney v. Kagenveama (In re Kagenveama)</u>, 541 F.3d 868 (9th Cir. 2008). Accordingly, the bankruptcy court concluded: "Instead of running away from status as above median debtors, they should have been embracing it, as they could have been arguing for an even shorter plan."

In the end, the bankruptcy court decided that the facts showed Debtors were not manipulating the schedules or their income to their advantage but, rather, that they and their attorney did not handle the case competently from the outset.

The court also found that given the size of the proposed plan payment, the budget submitted in the most recent schedules, and the substantial disbursement to unsecured creditors, Debtors' proposal to keep the first $1,400 of any tax refund was reasonable and prudent.

**3.    Postconfirmation Modification:    Third Amended Plan**

Debtors filed a third amended plan dated April 3, 2014, and requested modification of their confirmed plan based on increased income and expenses.  The third amended plan showed plan payments in the amount of $23,224.68 through March 2014 and $2900 per month commencing May 1, 2014.  The third amended plan

-7-

also indicated that Debtors would pay $109,000 to unsecured creditors for a return of 30% of their allowed claims.

On April 29, 2014, Mr. McCarthy filed an objection to Debtors' third amended plan. There, he stated that he received information that Mr. Martin had returned to regular, union assignment work shortly following the November 6, 2013 hearing on confirmation and that he had been regularly employed thereafter. Mr. McCarthy informed the court that he told the chapter 13 trustee about this development but that the trustee did not seek payroll information from Mr. Martin. According to Mr. McCarthy, Mr. Martin's income was a moving target.

Mr. McCarthy also argued that Debtors' increased income and reasonable expenses showed an after-tax income of $1,790 per month; yet, Debtors proposed only a $400 per month increase in the plan payment. Mr. McCarthy further asserted that there was no justification or explanation as to why the difference of $1,390 was not included in the plan. Finally, Mr. McCarthy objected to numerous increased expenses relating to cell phones, food, clothing and personal care.

The court scheduled an evidentiary hearing for September 3, 2014. Mr. McCarthy moved for a continuance and to compel discovery related to Debtors' income and expenses. On September 2, 2014, Debtors filed a notice withdrawing the motion to modify their confirmed plan. Eight days later, the bankruptcy court ordered a 2004 examination of Mr. Martin's employer, Western Partitions, and Ms. McCarthy's employer, DM2 Software. In response, Debtors filed fifth amended Schedules I and J stating higher income for Mr. Martin.

-8-

**4.    Postconfirmation Modification:    Fourth Amended Plan**

Debtors filed a fourth amended plan dated September 27, 2014, and again moved to modify their plan due to increased income and expenses.  This plan showed payments in the amount of $40,209.28 through September 2014, $633 per month for six months commencing October 2014, and $2300 per month thereafter.  The plan indicated that Debtors would pay $73,402 to nonpriority unsecured claims for a return of 27.3% on their allowed claims.

Debtors also moved for permission to incur debt for the purchase of a second new car.  They declared that the Kia was not driveable and disclosed that they sold the car to a repair shop for $2,000.  The sale price, according to Debtors, was the amount Ms. McCarthy was offered for the Kia as a trade-in.

Mr. McCarthy again objected to Debtors' fourth amended plan.  He complained that Debtors' amended Schedule J increased most of their expenses without showing any change in circumstances to support the increases.  Mr. McCarthy also objected to Mr. Martin's child support obligation which was listed as an expense in an amended Schedule J for the first time.  Finally, Mr. McCarthy argued that Debtors did not need a another new vehicle.

The chapter 13 trustee supported Debtors' requested modification.  The trustee noted that Debtors voluntarily increased their monthly plan payment (from $2,307.00 to $2,676.92) in May 2014, following their disclosure of increased income.  The trustee also supported Debtors' request to purchase a new car.  Finally, the trustee informed the court that Debtors' request to temporarily allocate $1,667.00 per month for

-9-

appellate attorney fees was necessitated by Mr. McCarthy's conduct because the underlying appeal was being prosecuted by him and not by Debtors.

On November 4, 2014, the bankruptcy court held a hearing on the matter. The bankruptcy court allowed a reduction in the plan payments, granted Debtors' request to employ an appellate attorney for the pending state court appeal, and allowed Mr. Martin to make his child support payment. The bankruptcy court made no rulings with respect to other issues raised by Mr. McCarthy relating to Debtors' expenses. Those issues were reserved for a later evidentiary hearing.

On November 20, 2014, the bankruptcy court entered an order modifying Debtors' chapter 13 plan. The court ordered that on the effective date of the plan, October 1, 2014, their monthly payment obligation was reduced to $1124 per month to reflect Debtors' ongoing legal fee expenses. The court further ordered that Debtors could submit a request for a vehicle purchase which, upon trustee approval, could result in further reduction of Debtors' plan payment obligation. Finally, the court ordered that Mr. Martin's ongoing child support obligation was approved as an allowable expense.[6]

Debtors subsequently obtained a court order authorizing them to purchase a new vehicle.

**5.    Mr. McCarthy's Motion to Dismiss**

On December 31, 2014, Mr. McCarthy filed an updated motion

---

[6] According to Mr. Martin, the state court ordered him to pay $1,328 a month in child support effective October 1, 2014.

-10-

to dismiss Debtors' case with prejudice, alleging bad faith. He argued that (1) Debtors misrepresented facts in their petition and supporting schedules; (2) Debtors commenced the case to defeat state court litigation, i.e., enforcement of the $224,000 judgment; (3) Debtors exhibited bad faith in the continuing manipulation of their income and living expenses schedules, seeking to minimize their apparent, disposable income commitment; (4) Debtors disposed of personal property, the Kia, without court authority and without a timely accounting of such disposal to the court; (5) Debtors concealed Mr. Martin's income from the court and the trustee; (6) Debtors routinely inflated and misstated their Schedule J living expenses; (7) Debtors evaded discovery of their income and expenses; (8) Debtors appeared to have filed a materially false Form 1040 income tax return for 2013; and (8) Ms. McCarthy improperly used her company credit card for personal expenses which increased her debt. Based on these allegations, Mr. McCarthy argued that Debtors' conduct was "egregious", warranting dismissal of their case with prejudice under the factors set forth in Leavitt.

The chapter 13 trustee supported dismissal if the allegations were proved at an evidentiary hearing.

In opposition, Debtors maintained that most of the issues raised by Mr. McCarthy were previously adjudicated. They further explained that Mr. Martin was unemployed at the time of confirmation and receiving unemployment benefits. They explained that his income increased postconfirmation because Mr. Martin was assigned to a project in Beaverton, Oregon. At the beginning of December 2013 he was laid off for one week and

-11-

then dispatched for work in Pullman, Washington and then to Moscow, Idaho. Debtors maintained that they provided evidence of Mr. Martin's income to the trustee on February 24, 2014.

Debtors also explained their "alleged" fraudulent tax returns contained errors and had been corrected by a CPA. They further argued that Ms. McCarthy's use of her company's credit card was authorized as her employer allowed her to use the card for non-business expenses during her travel and those amounts were reimbursed to her employer.

As explained below, Mr. McCarthy's motion to dismiss was scheduled for an evidentiary hearing at the same time as Debtors' request to further modify their confirmed plan and to resolve outstanding issues related to their fourth amended plan.

**6. Postconfirmation Modification: Fifth Amended Plan**

Debtors filed a fifth amended plan dated March 23, 2015, based on increased income and expenses. They also filed amended Schedules I and J. In the fifth amended plan, they proposed payments of $1124 for six months, then $1,044 for two months, and then had payments resume at at $2711 per month. This plan showed that Debtors would pay at least $85,665 to nonpriority unsecured claims which was approximately 32.43% of their allowed claims.

On April 28, 2015, Mr. McCarthy objected to the fifth amended plan on several grounds including, among others, that Debtors were not acting in good faith in either the filing of their case or the proposal of their modified plan. He further complained that Debtors had understated Mr. Martin's income and Ms. McCarthy's earnings by omitting bonus payments made to her

-12-

which averaged $500 per month from December 2013 through January 2015.  Finally, he pointed out that Debtors' 2013 and 2014 tax returns showed that Debtors improperly took deductions.  As a result, Mr. McCarthy asserted that Debtors owed over $23,000 in taxes for those years.  Mr. McCarthy also alleged that Debtors intentionally under-withheld taxes and spent the extra income which, in turn, created a large postpetition obligation that diverted disposable income from their creditors.

### 7.    The Evidentiary Hearing

An evidentiary hearing on Mr. McCarthy's motion to dismiss and Debtors' motion to modify their plan commenced on May 6, 2015, and continued on September 1-2, 2015.  At the May hearing, Ms. McCarthy testified concerning various issues including her use of her employer's company credit card for personal expenses and discrepancies on her tax returns.[7]

Mr. Ford, the owner of the repair shop that purchased the Kia, also testified.  He testified that the car was not safe to drive, that he quoted a price of $1,500 minimum to make the car safe, and that he purchased the car for $2,000 and sold it for $4,700 once it was in salable condition.  To make it salable, Mr. Ford replaced the brakes and put two new tires on the car.

Mr. Burkard, a fifty percent owner of DM2 Software, Inc., testified that there was no prohibition to Ms. McCarthy using the company credit card for personal expenses at the time she incurred those expenses.  Since then, the company changed its

---

[7] The transcripts contain only excerpts of the witness's testimony.

-13-

policy and now prohibits employees from charging non-business expenses on the credit card. He also testified as to the amount of Ms. McCarthy's bonuses and indicated that they were likely to continue.

Finally, Mr. Erickson, the CPA who prepared Debtors' tax returns, testified as to how he identified errors on Debtors' 2013 tax return and prepared their 2014 tax return. Mr. Erickson testified that Debtors appeared to owe several thousand dollars over the amount they had withheld for 2014 taxes. He also testified that he had made errors himself on the returns which were based on Debtors' representations.

On September 1, 2015, Mr. Martin testified about his employment in 2013. He did not recall whether he worked for Western Partitions, his employer, for the bulk of that year.

On September 2, 2015, Mr. Martin testified that he no longer had the $2,000 from the sale of the Kia. He was also questioned about $3,250 that Debtors spent on rental cars from Hertz after they sold the Kia for $2,000. Although Mr. Martin said he could not recall the brands of the cars that were rented, he later recalled that at one point it was a Dodge minivan and at another point a GMC pick-up truck. He also could not recall how long the cars had been rented for. Mr. Martin further testified that Debtors had not saved any money for a down payment on a new car.

Mr. Martin conceded that it was error to claim one of the McCarthy's sons as an exemption on their tax return and further testified that it was error to claim a $5,000 deduction for a contribution to an IRA account since he had no such account in

-14-

2013.

Mr. Martin further testified that Debtors continued to send their daughter to a private school for $600 a month because the school offered a higher quality education than the public school.

Finally, Mr. Martin testified that he was delinquent in his support payments but was not certain as to how many months.

Mr. McCarthy also testified that Mr. Martin was four months delinquent in his support payments. He further opined that Debtors budgeted $2,000 more than necessary for the payment of attorney's fees to Ms. McCarthy's state court lawyer.

Closing arguments were held on September 14, 2015. Debtors' counsel argued that dismissal was not necessary and that there were other remedies available to the court besides dismissal with prejudice. Counsel noted that a six month bar to re-filing would force Debtors to forego over $60,000 and 29 months of progress towards discharge. Counsel also noted that Mr. McCarthy would be able to execute on his judgment over the course of the next six months and observed that he would collect a greater portion of the payments in a subsequent chapter 13 because Debtors' child support obligation to him would run its course over the next few years. Finally, counsel argued that the court should not dismiss Debtors' case but requested that any dismissal be without prejudice.

Counsel for the chapter 13 trustee represented that the trustee supported dismissal of the case based on his view that Debtors had not really approached the bankruptcy with an eye towards reorganization of their personal finances. The trustee

-15-

also thought that Debtors were not truthful as to their income despite repeated opportunities to disclose to the trustee exactly what they expected in the future. According to the trustee, evidence of any additional income had to be obtained through repeated discovery requests. Finally, the trustee opined that the case was a two-party dispute with no end in sight. He qualified his support of dismissal, however, by observing that Debtors may have presented a sufficient argument against dismissal with prejudice or suggested that a lesser sanction would be appropriate.

The court took the matter under advisement.

### 8.   The Bankruptcy Court's Order

On October 21, 2015, the bankruptcy court issued its findings of fact and conclusions of law in an order dismissing Debtors' case without prejudice and denying Debtors' motion to modify their plan.

### 1.   Findings of Fact

Income: The court found that Debtors had understated or failed to effectively disclose their income. Based on the evidence, the court noted that Ms. McCarthy did not report her bonus income of $8,943 to the chapter 13 trustee or in Debtors' amended schedules and that Debtors had understated Mr. Martin's income by over $20,000 for the postconfirmation period of November 2013 to September 2014.

Sale of the Kia: Although there was some question whether Ms. McCarthy sold the Kia prior to obtaining court approval, the court did not find that important. The court noted that Debtors received approval from the trustee in January 2015 for the

-16-

purchase of a new vehicle and that since March 2015, their schedules showed a $350 a month deduction for a new car payment. However, Debtors testified at the evidentiary hearing that they took the $2,000 from the sale, deposited it into their bank account and spent it in the ordinary course. Mr. Martin testified that they have been unable to buy another vehicle since they no longer had funds for a down payment.

Tax Returns: The bankruptcy court found that the evidence showed that Debtors owed over $23,000 in taxes for the 2013 and 2014 tax years because they had claimed numerous improper deductions. Although Ms. McCarthy had testified that she found the tax software confusing when she prepared Debtors' original tax returns, the court did not find her testimony credible when her job was associated with computer software in the petroleum industry. The court opined that had Debtors filed the 2013 return with the properly claimed deductions, they would likely have been able to modify their plan to reflect the need to pay the resulting tax liability, with little adverse consequence. The court observed that Debtors' "irresponsible claims of deductions . . . simply played into the hands of Mr. McCarthy. They certainly should have expected that Mr. McCarthy would have scrutinized their return."

Company Credit Card: The court found Ms. McCarthy's use of her company credit card to pay for her father's airline ticket on two occasions so that he could accompany her in her travel was de minimis and not prohibited by the company at the time the expenses were incurred.

Expenses. The court also noted that the costs associated

-17-

with Debtors' daughter's private schooling was $600 per month which was above the National standard of $156. The court observed that Debtors had claimed the expense only since March 2014 and that they maintained that their daughter needed to attend the private school as a public school would hold her back educationally.

Next, the court addressed Mr. Martin's child support obligation, noting that prior to confirmation, Debtors never listed any child support owed by him. The court also noted that no documentation regarding Mr. Martin's support obligation was put into evidence, but he testified that the obligation was imposed in October 2014 and that Debtors made the payment from their bank account but are frequently delinquent on the payment.

Spending Habits. Last, the court noted that there had been extensive examination and testimony about Debtors' expenses and spending habits. There was evidence showing vacations, five phone lines, and that Debtors ate out a substantial amount of the time with almost daily purchase of fast food. The court found that the bank statements put into evidence by Mr. McCarthy showed Debtors were constantly overdrawn on their accounts. In light of this evidence, the bankruptcy court found that there was no indication that Debtors attempted to rein in their spending and reorganize in good faith.

In the end, the bankruptcy court found that Debtors were not forthcoming about disclosing either their income or their actual expenses. The court concluded that it was clear they could not obtain financial stability even with the increased income and improper claims of tax deductions. However, the

-18-

court also found that Mr. McCarthy was equally to blame "for this debacle." The court noted that he closed his accounting practice and unsuccessfully argued in state court and on appeal that Ms. McCarthy was obligated to pay higher child support for him to stay at home with their sons, who are both teenagers. See McCarthy v. McCarthy, 2015 WL 5139089 (Wash. Ct. App. Sept. 1, 2015). The court further observed that Mr. McCarthy spent much of his time scrutinizing Debtors' income and spending habits and preparing exhaustive spreadsheets showing the Debtors' income and expenses.

The bankruptcy court reiterated that Debtors ended up confirming a plan which proposed payments to unsecured creditors, primarily Mr. McCarthy, which exceeded what they would have had to pay if they had properly calculated their projected disposable income as above median debtors from the outset. The court observed that Debtors had been making substantial payments to the chapter 13 trustee under their plan which resulted in substantial distributions to Mr. McCarthy over and above the ongoing child support obligation.

### 2. Legal Conclusions

In its legal conclusions, the bankruptcy court first noted that although it had found in the November 2013 confirmation hearing that Debtors had proposed their plan in good faith, the court could review that finding postconfirmation if new information had come to light. See In re Luxford, 368 B.R. 63, 70-71 (Bankr. D. Mont. 2007) (considering trustee's post confirmation motion to dismiss for lack of good faith after discovering that debtors had confirmed a plan based on fraud,

-19-

where debtors had purposely omitted assets and transactions from their schedules and statements such that the Chapter 13 plan did not actually meet the best interests of creditors test of § 1325(a)(4)).

Accordingly, the court considered again the four factors of the Leavitt test to determine whether, under the totality of the circumstances, Debtors were acting in good faith. These factors are: (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Code, or otherwise filed his petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended to defeat state court litigation; and (4) whether egregious behavior is present. In re Luxford, 368 B.R. at 70. In considering these factors, the court noted dismissal turned on the first and the fourth factors because it had previously found the second and third factors were not met in its findings on confirmation of Debtors' second amended plan. The bankruptcy court found that nothing presented at the May and September 2015 hearings changed those findings.

First Leavitt Factor: As to misrepresentation of facts, unfair manipulation of the Bankruptcy Code and/or the filing of a plan in an inequitable manner, the court found that the most glaring example was the understatement of both Mr. Martin's and Ms. McCarthy's income to the tune of almost $30,000. Ms. McCarthy's bonuses were not disclosed, and Mr. Martin was listed as unemployed when he was in fact employed. The court observed that early in 2013 Mr. Martin's income may have been sporadic due to the economy, but his situation had improved. The court

-20-

noted that even when his employment was disclosed, the earnings were understated.

According to the bankruptcy court, Debtors similarly misrepresented many of their expenses. The court observed that Debtors' bank account statements which showed how Debtors spent their money, little resembled their Schedule J. The court found that, rather than using funds on hand to make a down payment and buy a new vehicle as the Court approved, they used the $2,000 from the sale of the Kia for day to day expenses and then wasted another $3,250 renting brand new cars from Hertz. "Their $350 per month budget item for the purchase of a new car remains, nine months after the purchase was approved, a fiction." The court also noted that Debtors never demonstrated that Mr. Martin had an actual monthly support obligation of $1328 nor did they identify with any accuracy how or when that obligation was paid. Finally, the court observed that Debtors had not budgeted for the hundreds of dollars a month they incurred in overdraft fees from their bank as a result of the irresponsible spending habits.[8] In the end, the bankruptcy court concluded that Debtors' schedules did not accurately reflect their actual spending. Thus, this factor weighed in favor of dismissal.

Fourth Leavitt Factor: Next, the court considered whether egregious behavior was present. The court acknowledged that Debtors had not properly disclosed their income and expenses, had been irresponsible in some of their spending habits, and had

---

[8] In closing argument, Mr. McCarthy's attorney argued that for the period of January 1 through April 31, 2015, Debtors' average monthly overdraft was $419 a month.

-21-

filed initial tax returns which plainly and simply misstated their deductions. However, weighing against these facts was that Debtors were not living a luxurious lifestyle, and the court also noted they had been making substantial plan payments - likely more than they would have had to pay if they had properly filled out the Form B22C from the outset. The court further observed that Debtors were subjected to constant and unremitting scrutiny from Mr. McCarthy in their case and his continued efforts in the state court to contest matters arising from the dissolution of the McCarthys' marriage. These efforts, although unsuccessful, required Ms. McCarthy to incur additional attorney's fees. On balance, the court concluded that Debtors' behavior was not egregious.

Based upon the totality of the circumstances, the misstatement of income and expenses and, as mentioned by the chapter 13 trustee, a failure to demonstrate the kind of responsible spending that is required in a Chapter 13 case, the court found "cause" to dismiss Debtors' case under § 1307(c). The court concluded however that Debtors' conduct did not rise to the level warranting dismissal with prejudice.

Mr. McCarthy filed a timely notice of appeal from this order.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUE

Whether the bankruptcy court abused its discretion by not

dismissing Debtors' chapter 13 bankruptcy case with prejudice.

## IV.  STANDARDS OF REVIEW

We review the bankruptcy court's case dismissal for an abuse of discretion.  In re Leavitt, 171 F.3d at 1222-23.

To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible or "without support in inferences that may be drawn from the facts in the record."  United States v. Hinkson, 585 F.3d 1247, 1261–62 & n. 21 (9th Cir. 2009) (en banc).  "If the bankruptcy court did not identify the correct legal rule, or its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record, then the bankruptcy court has abused its discretion."  USAA Fed. Sav. Bank v. Thacker (In re Taylor), 599 F.3d 880, 887–88 (9th Cir. 2010) (citing Hinkson, 585 F.3d at 1261–62).

When a bankruptcy court makes factual findings of bad faith to support dismissal of a chapter 13 case, we review those findings for clear error.  In re Leavitt, 171 F.3d at 1222-23.  Whether or not a debtor's conduct rose to the level of egregiousness is a question of fact.  A court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record.  Hinkson, 585 F.3d at 1261-62 & n.21.  Under this standard, "[w]here there are two permissible views of the evidence, the fact finder's

-23-

choice between them cannot be clearly erroneous." <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 574 (1985).

## V.  DISCUSSION

**A.  Legal Standards:  Dismissal and Dismissal With Prejudice**

Section 1307(c) sets forth nonexclusive grounds which may constitute cause for dismissal of a chapter 13 case.  Although not specifically listed, bad faith is a "cause" for dismissal under § 1307(c).  <u>Eisen v. Curry (In re Eisen)</u>, 14 F.3d 469, 470 (9th Cir. 1994).  In this Circuit, bankruptcy courts make good faith determinations on a case-by-case basis, after considering the totality of the circumstances.  <u>In re Leavitt</u>, 171 F.3d at 1124.  In addition, a "'court must make its good-faith determination in the light of **all** militating factors.'"  <u>Ho v. Dowell (In re Ho)</u>, 274 B.R. 867, 876 (9th Cir. BAP 2002) (citing <u>Goeb v. Heid (In re Goeb)</u>, 675 F.2d 1386, 1390 (9th Cir. 1982)).

Section 349(a) expressly grants the bankruptcy court authority to dismiss a case with prejudice.  <u>In re Leavitt</u>, 171 F.3d at 1123.  A dismissal with prejudice is a severe and drastic sanction that is limited to extreme situations: "Generally, only if a debtor engages in egregious behavior that demonstrates bad faith and prejudices creditors—for example, concealing information from the court, violating injunctions, or filing unauthorized petitions—will a bankruptcy court forever bar the debtor from seeking to discharge then existing debts."  <u>In re Chabot</u>, 411 B.R. 685, 705 (Bankr. D. Mont. 2009) (citing <u>Colonial Auto Ctr. v. Tomlin (In re Tomlin)</u>, 105 F.3d 933, 937 (4th Cir. 1997)); see also <u>Ellsworth v. Lifescape Med. Assocs., P.C. (In re Ellsworth)</u>, 455 B.R. 904, 922 (9th Cir. BAP 2011)

-24-

(acknowledging that dismissal with prejudice is a drastic remedy reserved for "extreme situations."). Dismissal with prejudice imposes a bar on further bankruptcy proceedings between the parties and is a complete adjudication of the issues. In re Leavitt, 171 F.3d at 1123. "Functionally, then, a dismissal with prejudice is equivalent to a judgment under § 523(a) that each debt that would have been discharged under the debtor's plan is thereafter nondischargeable." In re Ellsworth, 455 B.R. at 922.

In deciding whether to dismiss a case with prejudice, Leavitt directs the bankruptcy court to consider the same four factors for dismissal based on "cause" and make a finding of bad faith based on egregious conduct. 171 F.3d at 1224. "The court is not obligated to count the four Leavitt factors as though they present some sort of a box-score but rather is to consider them all and weigh them in judging the 'totality of the circumstances.'" In re Lehr, 479 B.R. 90, 98 (Bankr. N.D. Cal. 2012).

**B. Analysis**

Here, in considering dismissal of Debtors' case in conjunction with confirmation of Debtors' modified plan, the bankruptcy court correctly examined the totality of the circumstances and considered the four factors enunciated in Leavitt to determine Debtors' good faith. See In re Luxford, 368 B.R. at 70-71; see also § 1329(b)(1) (incorporating good faith standard under § 1325(a)(3) for modification of a confirmed plan). On appeal, Mr. McCarthy has not challenged the legal standards that the bankruptcy court applied: instead, he

-25-

argues that the court's factual findings on the Leavitt factors were erroneous or an abuse of discretion. He also contends that reversal is warranted because neither Debtors nor the court provided any analysis for an alternative sanction which would have afforded him a sufficient remedy. These errors, according to Mr. McCarthy, demonstrate that the court abused its discretion in dismissing this case without prejudice.

We are not persuaded. "The bankruptcy court is not required to find that each [Leavitt] factor is satisfied or even to weigh each factor equally." Khan v. Curry (In re Khan), 523 B.R. 175, 185 (9th Cir. BAP 2014). Rather, "[t]he factors are simply tools that the bankruptcy court employs in considering the totality of the circumstances." Id. By applying the Leavitt factors in a totality of circumstances analysis, the bankruptcy court, as the trier of fact, determines whether there is "cause" for dismissal for bad faith and whether such dismissal should be with prejudice based on the debtor's egregious conduct. Here, the bankruptcy court applied the correct legal standards and only its factual findings are at issue. The court explicitly found that under the four factor test for determining bad faith set forth in Leavitt, only one of the four factors was present; i.e., factor one.

The First Leavitt Factor: this factor questions whether Debtors misrepresented facts in the petition or plan, unfairly manipulated the Code, or otherwise filed their petition or plan in an inequitable manner. The bankruptcy court found numerous misrepresentations regarding Debtors' income and expenses and found that this factor weighed in favor of dismissal. Nowhere

-26-

does Mr. McCarthy argue with any specificity why the court's findings related to this factor were erroneous. Based on our review of the record, we conclude that the bankruptcy court's findings under this factor were plausible and supported by inferences drawn from the facts in the record and thus not erroneous.

The Second Leavitt Factor: This factor looks at the history of filings and dismissals of prior bankruptcy cases. "A debtor's history of filings and dismissals is relevant" to the bad faith analysis. Nash v. Kester (In re Nash), 765 F.2d 1410, 1415 (9th Cir. 1985). Here, the bankruptcy court afforded Ms. McCarthy's prior bankruptcy filing little weight in its bad faith analysis because Ms. McCarthy had filed her chapter 7 case and received her discharge while the dissolution case was pending. The bankruptcy court found her filing was understandable given that Mr. McCarthy had received over $30,000 in sanctions against Ms. McCarthy during the dissolution proceedings and the on-going animosity between the parties.

Mr. McCarthy does not challenge these findings on appeal. Rather, he contends that the court erred by not considering Debtors' numerous filings in the case itself; i.e., they filed three Form B22c's all of which were false, seven sets of Schedule I and J's all of which falsely stated income and expenses, and six plans, only one of which was confirmed due to the court's reliance on Debtors' false testimony and Form B22c. In other words, all Debtors' filings and amendments were false. These facts, however, do not make the bankruptcy court's findings on the second Leavitt factor clearly erroneous.

-27-

When evaluating the second Leavitt factor, a bankruptcy court is concerned with prior bankruptcy case filings and dismissals and not with filings within the case itself. Actually, Mr. McCarthy's arguments about Debtors' "merry-go-round" of amended filings in the case is intertwined with the court's analysis under the first Leavitt factor; i.e., Debtors' misrepresentation of facts related to their income and expenses. Moreover, Mr. McCarthy ignores the bankruptcy court's factual findings regarding Debtors' initial schedules and Form B22c. The court initially found that the "mistakes" were largely due to the "sloppiness of Debtors' attorney, abetted by Debtors, neither of whom understood the basic strategy of chapter 13 practice applicable to their situation." In short, the bankruptcy court's findings on this factor were logical and supported by inferences drawn from the facts in the record and, thus, were not clearly erroneous.

The Third Leavitt Factor: This factor examines whether Debtors intended to defeat state court litigation. The bankruptcy court found that Debtors had not filed their petition to defeat state court litigation. Mr. McCarthy contends this was error. He points out that the facts in this case are similar to the facts in Leavitt. There, the debtor filed a chapter 13 petition approximately two weeks after a judgment on a jury verdict was entered against him and then he proposed zero payment to unsecured creditors in his first plan and 3% in his second plan. According to Mr. McCarthy, Debtors filed their petition just four days after Mr. McCarthy obtained his judgment and Debtors' original plan proposed paying unsecured creditors

-28-

2% and their amended plan proposed paying unsecured creditors 3%. He also asserts that this case is essentially a single creditor case since he represents 89% of all non-priority unsecured claims.

Again, these arguments do not make the bankruptcy court's findings under this factor clearly erroneous. Mr. McCarthy ignores the bankruptcy court's findings of fact under this factor and does not tell us why those findings are clearly erroneous. As the bankruptcy court noted, the portion of the McCarthy dissolution proceedings related to the $224,000 judgment was concluded when Debtors filed their case. Since Mr. McCarthy had threatened garnishment, the bankruptcy court found it was not surprising that Debtors filed for bankruptcy protection. The court also found that Mr. McCarthy's debt was not the only debt sought to be addressed by Debtors' case. Although he was the largest unsecured creditor, Debtors had issues with the large secured claim arising from their prepetition purchase of the minivan. Taken together, these facts do not show that Debtors' only purpose in filing was to defeat the state court litigation. See In re Eisen, 14 F.3d at 470 (bad faith exists where the debtor's only purpose is to defeat state court litigation).

Finally, the facts in Leavitt are distinguishable. Unlike Mr. Leavitt, Debtors confirmed a plan which paid 27% to unsecured creditors. In sum, the bankruptcy court's findings on this factor were logical and supported by inferences drawn from facts in the record and thus were not clearly erroneous.

The Fourth Leavitt Factor: This factor looks at whether

egregious behavior is present. This factor is relevant to Mr. McCarthy's request to dismiss this case with prejudice because under Leavitt the bankruptcy court must make a finding of bad faith based on egregious conduct. The bankruptcy court properly noted that egregious behavior demonstrates bad faith and prejudices creditors, such as concealing information from the court, violating injunctions, filing unauthorized petitions, hiding or undervaluing assets, making post-petition payments to pre-petition creditors, violating non-bankruptcy laws or otherwise demonstrating fraudulent conduct, without excuse. See In re Chabot, 411 B.R. at 704-705 (citing Leavitt, 171 F. 3d at 1223-24) and In re Cortez, 349 B.R. 608, 613-614 (Bankr. N.D. Cal. 2006).

The bankruptcy court acknowledged that Debtors had not properly disclosed their income and expenses, had been irresponsible in some of their spending habits, and had filed initial tax returns which plainly and simply misstated their deductions. However, in its totality of circumstances analysis, the bankruptcy court also considered all mitigation factors. See In re Ho, 274 B.R. at 876. Those factors included: Debtors were not living a luxurious lifestyle; Debtors had been making substantial plan payments - likely more than they would have had to pay if they had properly filled out Form B22C from the outset; and Debtors were subjected to constant and unremitting scrutiny from Mr. McCarthy in their case and his ongoing efforts in the state court to continue fights arising from the dissolution of the McCarthys' marriage. On this last point, the court observed that, although Mr. McCarthy was unsuccessful in

-30-

state court, his actions required Ms. McCarthy to incur additional attorney's fees. Accordingly, on balance, the court concluded that Debtors' behavior was not egregious.

With respect to this factor, Mr. McCarthy argues on appeal that Debtors' conduct throughout this case cumulatively amounts to nothing less than egregiousness. He further maintains that the bankruptcy court's findings concerning his conduct should be stricken because the allocation of blame was without any factual basis. We disagree with both contentions.

Mr. McCarthy's arguments fail to appreciate the reality that "bad faith" is a term which is used to describe a broad range of improper conduct, only some of which is sufficient to support the extreme sanction of dismissal with prejudice. In Leavitt, the Ninth Circuit held that dismissal with prejudice must be coupled with a finding of bad faith based on egregious conduct. 171 F.3d at 1224. In other words, dismissal with prejudice under § 349(a) is not meant to be a remedy for every instance of debtor misconduct.

On the evidence before it, the bankruptcy court was not persuaded that Debtors' case was associated with sufficient bad faith to justify dismissal with prejudice. The bankruptcy court applied the correct legal standards and, as noted above, its factual findings were plausible and supported by inferences drawn from the facts in the record. We cannot reverse the bankruptcy court's findings of fact simply because we might have decided the case differently. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

-31-

Moreover, as already noted, the bankruptcy court was directed to consider all militating factors and therefore could properly consider Mr. McCarthy's conduct throughout this case.

Finally, Mr. McCarthy argues that the bankruptcy court abused its discretion by failing to consider alternative remedies to dismissal with prejudice as instructed by Ellsworth. Mr. McCarthy is mistaken. First, in its findings and conclusions, the bankruptcy court expressly recognized that dismissal under § 1307(c) is a two-step process: first the court must determine whether there is cause for dismissal; then there should be some consideration of whether a sanction less than dismissal with prejudice is sufficient. In re Ellsworth, 455 B.R. at 922. "For example, the Court could simply dismiss a case, or dismiss it with a 180 day (or some other length of time) bar to re-filing." Id. Therefore, the court approached the question of dismissal with prejudice by recognizing the two-step process and was well aware that lesser sanctions could be imposed.

Second, the debtors in Ellsworth did not advocate for, or present any evidence in support of, any alternative besides dismissal with prejudice. In contrast, Debtors here argued that dismissal was not necessary, but they also pointed out that there were other remedies available to the court besides dismissal with prejudice. In closing argument, counsel for Debtors argued that a six month bar to re-filing would force them to forego over $60,000 and twenty-nine months of progress towards discharge. Counsel also noted that Mr. McCarthy would be able to execute on his judgment over the course of the next

six months but that he would collect a greater portion of the payments in a subsequent chapter 13 because Debtors' child support obligation to him would run its course over the next few years. Finally, counsel argued that the court should not dismiss Debtors' case but, if it did dismiss, that it should dismiss without prejudice. Therefore, alternatives to dismissal with prejudice were placed squarely before the bankruptcy court.

Although Mr. McCarthy requested dismissal with prejudice, the court did not find sufficient bad faith to justify this extreme result. Therefore, it was unnecessary for the court to further explore, much less analyze, whether alternative remedies were appropriate. Mr. McCarthy mistakenly complains that the dismissal left him with no remedies at all when he has the full array of state law rights at his disposal. Moreover, from the bankruptcy court's comments, it is evident that Debtors paid more to Mr. McCarthy than the amount required by the bankruptcy code under their short-lived confirmed plan.

In sum, Mr. McCarthy offers no arguments on appeal that demonstrate that the bankruptcy court's dismissal of this case without prejudice was an abuse of discretion.

## VI. CONCLUSION

For the reasons stated above, we AFFIRM.