FILED

FEB 05 2018

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

In re:                              )      BAP No.    NV-17-1168-LTiF
                                    )
PATRICIA G. OLSON,                  )      Bk. No.    3:17-bk-50081-BTB
                                    )
              Debtor.               )
_____ )
                                    )
PATRICIA G. OLSON,                  )
                                    )
              Appellant,            )
                                    )
v.                                  )      **M E M O R A N D U M***
                                    )
WILLIAM ALBERT VAN METER,           )
Chapter 13 Trustee;                 )
CODY BASS; CITY OF SOUTH            )
LAKE TAHOE; UNITED STATES OF        )
AMERICA; U.S. BANK, N.A.,           )
                                    )
              Appellees.            )
_____ )

Argued and Submitted on December 1, 2017
at Reno, Nevada

Filed - February 5, 2018

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce T. Beesley, Bankruptcy Judge, Presiding

_____

Appearances:     Anne J. Williams of the Law Offices of J. Craig
                 Demetras argued for Appellant Patricia G. Olson;
                 Seth Joseph Adams of Woodburn & Wedge argued for
                 Appellee Cody Bass.

_____

*This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

Before: LAFFERTY, TIGHE,** and FARIS, Bankruptcy Judges.

Memorandum by Judge Lafferty
Concurrence by Judge Tighe

The Debtor is 92 years old, legally blind, and resides in an assisted living facility. She sought chapter 13[1] relief to stop foreclosure of her commercial real property. One of the tenants at that property operated a marijuana dispensary on the premises and continued to pay rent to Debtor postpetition. Debtor's plan called for her to sell the commercial real property to pay off all creditors. At the hearing on the motion to sell and reject the lease with the tenant, the bankruptcy court dismissed the case sua sponte on the ground that Debtor's postpetition acceptance of rents from the dispensary business was an ongoing criminal violation that disqualified her from bankruptcy relief.

Because the bankruptcy court did not make adequate findings for us to discern the standard under which it concluded that dismissal was mandatory, we VACATE and REMAND.

**FACTS**[2]

Prepetition, Debtor Patricia G. Olson was the general

---

**Hon. Maureen A. Tighe, U.S. Bankruptcy Judge for the Central District of California, sitting by designation.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[2] The parties did not include all relevant documents in their excerpts of record. We have thus exercised our discretion to review relevant imaged documents from the bankruptcy court's electronic docket. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

-2-

partner of Olson Bijou Center, L.P., a California limited partnership ("OBC"). OBC owned real property on Lake Tahoe Boulevard in South Lake Tahoe, California, known as the Olson Bijou Shopping Center (the "Shopping Center Property").

Beginning in January 2013, Appellee Cody Bass began leasing space in the Shopping Center Property from OBC; although the record includes only an unsigned copy of the lease, the signature block on the lease indicates that it was to be signed by Debtor's son, Patrick Olson, as manager of OBC.[3] The lease expressly authorized Mr. Bass to operate a "dispensary."[4] Pursuant to that authority, Mr. Bass operated at the leased premises Tahoe Wellness Cooperative ("TWC"), a marijuana dispensary authorized under California law. Both the operation of the dispensary business and the leasing of the premises for such a business, however, potentially violated the federal Controlled Substances Act, 21 U.S.C. §§ 801-904 ("CSA"). The CSA classifies marijuana as a controlled substance, 21 U.S.C. § 812, and makes it unlawful to

> (1) knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance;

---

[3]In Debtor's declaration in support of the motion to reject lease, she stated that she believed the lease "agreements" were taken from her residence by government law enforcement authorities in May 2015. In Debtor's second declaration in support of the motions to sell and to reject, she stated, "[t]here is no signed lease agreement between Mr. Bass and me."

[4]The lease also required Mr. Bass to "comply with all statutes, codes, ordinances, orders, rules and regulations of any Federal, California, municipal or other governmental or quasi-governmental entity . . . ."

-3-

> (2) manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

21 U.S.C. § 856(a).

In early 2016, Mr. Bass and OBC entered into a letter of intent for Mr. Bass to purchase the Shopping Center Property for $4.2 million; Mr. Bass made a $25,000 payment to Debtor's attorney pursuant to the letter of intent. Shortly thereafter, Mr. Bass, OBC, and Debtor entered into an option agreement, which expired on March 3, 2016. Mr. Bass tendered an additional $50,000 to be applied to the purchase price if the option were exercised. According to Mr. Bass' declaration in support of his opposition to the motion to sell, he gave notice on April 1, 2016, that he was exercising the option agreement. He asserted that this notice was timely based on a First Amendment to Option Agreement attached to his declaration, which extended the deadline for exercising the option to April 4, 2016 and appears to be signed by Debtor. But in Debtor's second declaration in support of pending motions, she stated that Mr. Bass came to her assisted living facility on March 3, 2016, the day the option agreement expired, and asked her to sign papers, but she did not understand what she may have signed, and she believed Mr. Bass misled her into "signing something."[5]

_____

[5]We include these "facts" merely to provide some context for the proceedings before the bankruptcy court, and for no other purpose. And we should be particularly circumspect in this instance, in which we remand after determining that the
(continued...)

-4-

OBC and Debtor did not perform under the option agreement, and, in May 2016, Mr. Bass sued OBC, Debtor, and Mr. Olson in El Dorado County Superior Court for damages and specific performance.

The Shopping Center Property was encumbered by a deed of trust in favor of U.S. Bank, N.A. In August 2016 U.S. Bank recorded a notice of default, and in December 2016 it recorded a notice of sale. The foreclosure sale was set for February 1, 2017.

On January 30, 2017, Debtor filed a chapter 13 petition, which stayed both the foreclosure and the Bass litigation. That same day, she filed a quitclaim deed transferring OBC's interest in the Shopping Center Property to herself individually. Mr. Bass continued to pay rent postpetition to Debtor or her counsel.

About a month after the bankruptcy filing, the bankruptcy court approved a stipulation between Debtor and U.S. Bank for the use of cash collateral for Debtor's ordinary operating expenses and maintenance of the Shopping Center Property as well as assisted living expenses and health insurance, through April

[5](...continued)
bankruptcy court neither articulated the legal basis for its decision sua sponte to dismiss this case, nor identified with precision the facts which it must have determined, or upon which it might have relied, under any cognizable theory, in dismissing the case. Accordingly, we neither make any determination concerning what appear to be disputed facts, nor "weigh" any such facts, nor determine credibility, nor even, indeed, opine regarding what facts might be relevant under the as-yet-undetermined legal standard to be applied by the bankruptcy court on remand.

2017.  In exchange, Debtor granted U.S. Bank a postpetition replacement lien on all rents generated from the Shopping Center Property and agreed to make adequate protection payments of $4,000 per month.  According to the stipulation, at that time expected rental income was $16,220 per month, including TWC's monthly rental payment of $10,200.  In early May 2017, the court approved another cash collateral stipulation extending the agreement to use cash collateral through July 31, 2017 and modifying the budget to exclude the rent from TWC.  There is no evidence in the record to indicate whether the postpetition rents paid by Mr. Bass were used to make payments pursuant to the initial cash collateral stipulation; other than Debtor's counsel's oral representation that the May 2017 rent payment was being held in a safe in his office, the record does not show what happened to those funds at all.

Debtor's proposed chapter 13 plan called for monthly payments of $150 for 12 months and $2,100 for 48 months.  The plan also provided that Debtor would sell the Shopping Center Property within six months of plan confirmation and use the net proceeds to pay all administrative, priority, and unsecured claims.

In April 2017, Debtor filed a motion to sell free and clear under § 363(f) the Shopping Center Property and the adjacent property, which she also owned, for $3 million.  Among the conditions of the sale of the Shopping Center Property were (i) court approval of the rejection or termination of Mr. Bass' lease and the commencement of eviction proceedings by Debtor; and (ii) court-ordered rejection, termination, or voiding of the

option agreement with Mr. Bass. Debtor also filed a motion to reject the lease and the option agreement with Mr. Bass.[6] In her declaration in support of the motion to reject, Debtor stated that she had entered into the lease with Mr. Bass in January 2013 and that Mr. Bass "currently operates a medical marijuana dispensary at 3443 Lake Tahoe Blvd[.]" In a subsequent declaration filed May 11, 2017, Debtor further testified:

> 1. I am 92-years [sic] old and legally blind. I live in an assisted living facility in Sparks, Nevada.
>
> . . . .
>
> 9. At times prior to the filing of this case, my son, Patrick Olson, acted and served as my attorney-in-fact. In doing so, Patrick managed most of my financial affairs, which included the management of 949 Bal Bijou Road and 3443 Lake Tahoe Blvd. Patrick's duties included obtaining leases for the properties, collecting rents and paying all expenses, such as the secured mortgage payment to U.S. Bank, real property taxes and insurance premiums.
>
> 10. In 2012, Patrick Olson, through Olson Bijou Center L.P., leased space at 3443 Lake Tahoe Blvd. to Cody Bass.
>
> . . . .
>
> 15. I wish to end any involvement with Mr. Bass and his illegal business. I do not want to use money from Mr. Bass to fund my Chapter 13 Plan. I don't want to sell my property to Mr. Bass and do not want to finance his purchase of 3343 Lake Tahoe Blvd. I wish only to terminate any dealings with Mr. Bass and to sell my property and pay my creditors in full.

Mr. Bass opposed both motions. In his declaration in support of his opposition to the motion to sell, Mr. Bass

---

[6]The City of South Lake Tahoe (the "City") filed a joinder in the motion to reject on the ground that Mr. Bass' permit to operate the dispensary had expired and had not been renewed because the Debtor had not provided her written consent.

confirmed that he had been operating a marijuana dispensary on the premises pursuant to the terms of his lease with OBC and that he had paid rent to the Debtor postpetition.

Shortly thereafter, the chapter 13 trustee filed a motion to dismiss for failure to make plan payments and for failure to file an amended plan. Mr. Bass also filed a motion to dismiss the case on grounds that Debtor's acceptance of rents from his marijuana dispensary violated the CSA. Neither of those motions were heard because they were mooted by the bankruptcy court's sua sponte dismissal of Debtor's case.

At the initial hearing on the motion to sell and motion to reject, the bankruptcy court questioned whether it could authorize the sale, given that the Debtor had been accepting rents from leasing a marijuana dispensary; the parties argued the issue, and the court continued the matter for a few days to study the relevant authorities. At the continued hearing, the court heard additional argument but concluded, based on its interpretation of relevant case law, that because Debtor had continued to receive rent postpetition, the case had to be dismissed:

> I think it's a crime for Ms. Olson to be accepting rents from an illegal operation, so I am dismissing this case. . . . My finding is this debtor is leasing property for an unlawful purpose under federal law, although lawful under state law . . . and has continued to accept rents during the course of her bankruptcy.

Hr'g Tr. (May 22, 2017) at 6:4-5; 22-25. In response to a request for clarification from Debtor's counsel, the court explained:

> [I]f the debtor has committed a crime during the course

of the bankruptcy and continued for several months to commit a crime during the course of the bankruptcy, I think that is a basis for not providing relief to the debtor. Had the debtor, prior to filing bankruptcy or not during the bankruptcy had not committed the crime of taking money from a marijuana operation, I would feel differently. But that's not what happened here. Because you don't, in my opinion, get to go through five or six months of a bankruptcy knowingly receiving illegal proceeds and then say, oh, I'm not going to take those anymore, I want to sell the property now, so I get to play here. I don't think that's correct.

Id. at 7:17-8:3. The bankruptcy court entered its sua sponte order dismissing the case on May 31, 2017; the court also granted a stay pending appeal. Debtor timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court abused its discretion in dismissing Debtor's chapter 13 case.

## STANDARD OF REVIEW

We review a bankruptcy court's dismissal of a chapter 13 case for abuse of discretion. Ellsworth v. Lifescape Med. Assoc., P.C. (In re Ellsworth), 455 B.R. 904, 914 (9th Cir. BAP 2011). A bankruptcy court abuses its discretion if it applies the wrong legal standard, misapplies the correct legal standard, or if its factual findings are clearly erroneous. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

## DISCUSSION

Ordinarily, a bankruptcy court grants or denies relief based

on a specific provision in the Code. Here, the bankruptcy court did not specify what Code section or other authority it relied upon in dismissing Debtor's case. The court concluded, apparently based on case law from other jurisdictions, that Debtor's postpetition receipt of rental payments from a tenant that operated a marijuana dispensary on property she owned was (i) a violation of the CSA that (ii) constituted grounds for dismissal of the case. The legal basis for dismissal could have been bad faith under § 1307(c), but the bankruptcy court made no bad faith finding and did not engage in the totality of the circumstances analysis required for dismissal under that Code section.

Alternatively, the bankruptcy court may have been acting pursuant to its inherent power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." § 105(a). But, if acting pursuant to its inherent powers, the court could act only "within the confines of the Bankruptcy Code." Law v. Seigel, 134 S. Ct. 1188, 1194-95 (2014) (citations omitted). And where a statute adequately addresses the conduct at issue, the court's inherent powers should be invoked only when that statute does not fully address the situation at hand. See Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991) ("[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power [in imposing a sanction for bad faith litigation conduct].").

But the bankruptcy court did not articulate the legal basis for its ruling or make findings to support its conclusions that

-10-

the CSA was being violated and that that violation was grounds for dismissal. When a court imposes the harsh penalty of dismissal in circumstances such as those presented here, it is imperative that it state with clarity and precision its factual and legal bases for doing so.

The standard for dismissal of a chapter 13 case is set forth in § 1307(c). That section provides that on request of a party in interest and after notice and a hearing, the bankruptcy court may convert a chapter 13 case to chapter 7, or may dismiss a case, whichever is in the best interests of creditors and the estate, for "cause." § 1307(c).[7] Section 1307(c) sets forth a non-exclusive list of factors that constitute "cause" for conversion or dismissal.[8] In dealing with questions of conversion and dismissal, the bankruptcy court engages in a two-step process: "First, it must be determined that there is 'cause' to act. Second, once a determination of 'cause' has been made, a choice must be made between conversion and dismissal based on the

[7]Although that statute requires a request by a party in interest or the United States trustee, the bankruptcy court may dismiss or convert a case sua sponte under § 105(a). Tennant v. Rojas (In re Tennant), 318 B.R. 860, 868-70 (9th Cir. BAP 2004). Additionally, despite § 1307's requirement of notice and a hearing, due process is satisfied if the impacted party has had an opportunity to be heard. See id. at 870 (noting that the concept of notice and a hearing is flexible and depends on what is appropriate in the circumstances). Debtor does not argue that her due process rights were violated, nor does she dispute that the court had the authority to sua sponte dismiss the case.

[8]Those enumerated factors include: unreasonable delay by the debtor that is prejudicial to creditors; failure to commence making timely payments; denial of confirmation of a plan; and material default by the debtor with respect to a term of a confirmed plan.

-11-

'best interests of the creditors and the estate.'" Nelson v. Meyer (In re Nelson), 343 B.R. 671, 675 (9th Cir. BAP 2006).

Although not listed, bad faith is cause for dismissal. Leavitt v. Soto (In re Leavitt), 171 F.3d 1219, 1224 (9th Cir. 1999). In determining bad faith, the bankruptcy court is to apply a totality of the circumstances analysis, considering (1) whether the debtor misrepresented facts in her petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed her chapter 13 petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor only intended to defeat state court litigation; and (4) whether egregious behavior is present. Id.

On appeal, Debtor assumes the bankruptcy court dismissed her case on grounds of bad faith by arguing that the bankruptcy court abused its discretion in not considering the totality of the circumstances, especially the fact that Debtor was using the bankruptcy to sever her ties with Mr. Bass' business. But the bankruptcy court did not invoke § 1307(c), nor did it explicitly find bad faith.

The bankruptcy court stated that it had "looked at the cases," but did not articulate any rules drawn from those cases that applied to the facts before it. The case law addressing facts such as those presented here is sparse, and there is no controlling authority in the Ninth Circuit.

Some courts have held that, to the extent estate assets are used for or generated by the operation of a federally prohibited marijuana business, a trustee or debtor in possession may not administer those assets without violating federal law. Arenas v.

-12-

U.S. Tr. (In re Arenas), 535 B.R. 845, 852 (10th Cir. BAP 2015); In re Medpoint Mgmt., LLC, 528 B.R. 178, 184-85 (Bankr. D. Ariz. 2015), vacated in part, Medpoint Mgmt., LLC v. Jensen (In re Medpoint Mgmt., LLC), BAP No. AZ-15-1130-KuJaJu, 2016 WL 3251581 (9th Cir. BAP Jun. 3, 2016); In re Johnson, 532 B.R. 53, 56-57 (Bankr. W.D. Mich. 2015);[9] In re Rent-Rite Super Kegs W., Ltd., 484 B.R. 799, 810 (Bankr. D. Colo. 2012). The bankruptcy court here made no finding, however, that the trustee would be administering the proceeds of an illegal business, and there is no evidence in the record that the rents were to be used to fund the plan.

Some courts have held that a bankruptcy filing or a plan of reorganization proposed by a debtor who is involved in an illegal enterprise is not in good faith, even where the debtor does not have a subjective bad motive, is in legitimate need of bankruptcy relief, and there is otherwise no indicia of an attempt to abuse the bankruptcy process. In re Arenas, 535 B.R. at 852-53; In re Rent-Rite Super Kegs W., Ltd., 484 B.R. at 809. Related to the good faith analysis, some courts have concluded that a debtor engaged in an illegal business who seeks bankruptcy relief comes into court with unclean hands and is not eligible for relief. In

---

[9]In In re Johnson, the bankruptcy court acknowledged the problems created when a debtor who operates a marijuana business that is legal under state law seeks bankruptcy relief, noting that continued operation of the marijuana business would result in the court and the trustee tacitly supporting the debtor's criminal enterprise. 532 B.R. at 56-57. Nevertheless, the court ruled that it would permit the debtor to remain in chapter 13 on the condition that he stop engaging in the marijuana business. Id. at 58. The bankruptcy court here explicitly disagreed with this approach.

-13-

re Rent-Rite Super Kegs W., Ltd., 484 B.R. at 807; cf. In re Medpoint Mgmt., LLC, 528 B.R. at 186-87 (petitioning creditors who knew the putative debtor was engaged in a federally prohibited medical marijuana business had unclean hands and could not seek relief from the bankruptcy court).

The bankruptcy court here made no finding of bad faith or unclean hands. Further, it concluded that it was a crime for Debtor to be accepting rents from Mr. Bass' business without making any findings showing that all the elements of a CSA violation had been established (such as the requirement that the conduct be "knowing").

The foregoing cases suggest possible reasons for the court's decision, but without specific findings and conclusions, we cannot determine whether or how the court found those cases applicable to the facts of this case, nor can we adequately evaluate the propriety of the bankruptcy court's ruling.

Accordingly, on remand, the bankruptcy court should articulate the findings that led it to determine that Debtor was violating the CSA and what legal standard it relied upon in dismissing the case.

**CONCLUSION**

For the reasons set forth above, we VACATE and REMAND.

Concurrence begins on next page.

-14-

TIGHE, Bankruptcy Judge, CONCURRING.

I concur in the memorandum and write separately to emphasize (1) the importance of evaluating whether the Debtor is actually violating the Controlled Substances Act and (2) the need for the bankruptcy court to explain its conclusion that dismissal was mandatory under these circumstances. With over twenty-five states allowing the medical or recreational use of marijuana, courts increasingly need to address the needs of litigants who are in compliance with state law while not excusing activity that violates federal law. A finding explaining how a debtor violates federal law or otherwise provides cause for dismissal is important to avoid incorrectly deeming a debtor a criminal and denying both debtor and creditors the benefit of the bankruptcy laws.

As the memorandum details, there are a number of situations where the federal prohibition on marijuana distribution prevented debtors from reorganizing or liquidating under federal bankruptcy laws. Typically, these were cases where the debtor sought to continue to distribute marijuana postpetition or where a trustee would be asked to accept proceeds of a drug-related business, situations where federal law would clearly be violated. See, e.g., In re Arenas, 535 B.R. 845 (debtors themselves grew and sold marijuana); In re Rent-Rite Super Kegs W., Ltd., 484 B.R. 799 (debtor's ongoing postpetition leases with marijuana-growing tenant exposed debtor to criminal liability and primary asset to forfeiture).

This Debtor's plan did not necessarily require the rental income from the dispensary to fund the proposed payments. It

-1-

provided for minimal plan payments until a sale motion could be filed and the Debtor's real property sold. The sale of Debtor's real property would have been simply a liquidation of legal estate assets. In fact, but for the marijuana-related proceeds, the sale of real property to fund a plan is a common scenario because of the ability in bankruptcy to sell property subject to a bona fide dispute free and clear of a lien. See § 363(f)(4).

If, on remand, the basis for dismissal is the court's concern that Debtor committed a crime by receiving postpetition rent derived from a marijuana business, an explicit finding of the facts required for criminal liability is needed. Section 856(a)(2) of Title 21 prohibits a person with a premises from knowingly and intentionally allowing its use for the purpose of distributing drugs. United States v. Tamez, 941 F.2d 770, 774 (9th Cir. 1991). A violation of section 856(a) also requires a showing that a primary or principal use of the premises is for drug distribution or manufacture. See United States v. Mancuso, 718 F.3d 780, 794-96 (9th Cir. 2013). Any prosecution of this crime would require a showing that Debtor knew that Mr. Bass leased the property to operate a marijuana dispensary, and that she intended to allow that use.

The Debtor's personal knowledge is an especially critical inquiry for an elderly, blind woman residing in assisted living with an attorney-in-fact in charge of the lease. Although Debtor stated in her second declaration in support of the motion to reject the lease that Bass was operating a medical marijuana dispensary, the record does not indicate when Debtor became aware of this. She stated in that declaration that she did not want to

-2-

be involved in leasing to a marijuana business.

Any prosecution of 21 U.S.C. § 856(a)(2) would need to prove beyond a reasonable doubt that Debtor herself "knowingly and intentionally" leased the property where the marijuana is distributed. See Elonis v. United States, 135 S. Ct. 2001, 2009 (2015) (general rule is that a guilty mind is a necessary element in the proof of every crime); Morissette v. United States, 342 U.S. 246, 252 (1952) ("wrongdoing must be conscious to be criminal"). Debtor's son's knowledge in acting for her cannot be imputed to Debtor for purposes of showing criminal knowledge and intent. Nor can Mr. Bass' intent and knowledge be imputed to the Debtor.

Bankruptcy courts have historically played a role in providing for orderly liquidation of assets, equal payment to creditors, and resolution of disputes that otherwise would take many years to resolve. Although debtors connected to marijuana distribution cannot expect to violate federal law in their bankruptcy case, the presence of marijuana near the case should not cause mandatory dismissal.[1] I believe this focus on specific federal violations along with the further analysis required by the lead memorandum properly address the challenge of a marijuana related case.

---

[1]Cf. Northbay Wellness Grp., Inc. v. Beyries, 789 F.3d 956, 960-61 (9th Cir. 2015) (bankruptcy court abused its discretion by failing to conduct the balancing test required by doctrine of unclean hands, and instead determining that unclean hands applied solely because the creditor had engaged in marijuana distribution).